The evidence was sufficient to support the conviction of murder; and the verdict having the approval of the trial judge, the judgment overruling a motion for new trial on the general grounds must be affirmed. Two JJ., dissent.
 No. 14693. NOVEMBER 10, 1943.
James Josey was convicted of murder, without a recommendation. The indictment charged that on February 11, 1943, in Terrell County he "did then and there unlawfully and with force and arms, feloniously and with malice aforethought, wantonly and with reckless disregard for human life, drive and operate an automobile on and over the public highway in this State, running through the City of Dawson, Georgia, and known as Main Street in said city, *Page 83 
and being a part of State Route No. 55, and near the fire department in the City of Dawson, and while under the influence of intoxicating liquors and drugs, and while so operating said automobile over said highway did approach and overtake one J. D. Bridges, a human being in the peace of the State, who was marching down said highway with a company of soldiers, said James Josey not then and there having said automobile under immediate control, as provided by law, so that as a result of said unlawful, wanton, and reckless operation of said automobile by James Josey said automobile was driven on, over, and into said J. D. Bridges, thereby killing and murdering said J. D. Bridges by then and there inflicting a mortal wound in and upon the person of the said Bridges, then and there causing the death of the said Bridges, contrary to the laws of said State, the good order, peace, and dignity thereof." The defendant entered a plea of not guilty.
On the trial no witness was introduced on behalf of the defendant. The first witness for the State was a physician who had attended and examined Bridges, and who testified: "Injuries sustained in a supposedly automobile accident caused his death."
The next witness was Easter Kemp, who testified: She was riding on the front seat of the automobile, sitting beside the accused, who was driving the car. She did not smell any whisky on his breath, and did not know whether or not he was drinking. "I did not see these soldiers in the road before he hit them. I do not know whether he saw them. I was not doing anything at the time he hit these soldiers. I was sitting in the front seat, and by the time I could hollo out he had done run into them, so close on them he couldn't stop. I did not say anything to him before he ran into the soldiers. He did not say anything to me. We were not talking at the time. He did not stop after he hit these soldiers; he kept going. . . I told him to stop. He did not stop. He didn't say anything at all. I didn't hear him. He speeded up his car after he hit these soldiers. This happened in front of the fire department. That is on Main Street in Dawson, Georgia. That is a part of route No. 55. . . I know where East Church Street crosses Main Street up above the fire department. There were two street lights on each side of Church Street where it crosses Main Street. I know where the library is on east side of Main Street. I don't know whether the light is out there. I *Page 84 
don't know whether there are any lights along Main Street from Church Street to where defendant ran into Home Guard. There are trees on each side of the street, quite a few trees on the east side and some on other side. I did not see the actual collision. I saw a shotgun or rifle that is used by them come through the windshield. I didn't see any people until we got right upon them about the time we run into them. We were coming down the street this way at time this happened. He picked me up at my house. We went to church. The name of the church is Beulah. We were on our way back from the church at the time this accident occurred."
McGraw, a deputy sheriff, testified: "I arrested James Josey the next morning. . . He made a statement to me about this transaction. I did not threaten him in any way. I offered him no inducement or hope of reward. That statement was freely and voluntarily made to me by James Josey. In that statement he admitted driving the car. I asked him if he had been drinking liquor. He said he drank some the afternoon before. He said he and four more — three more drank a pint. He was not drinking when I arrested him. He said he had been drinking before accident occurred. I am familiar with where Church Street intersects Main Street. There are two white lights at each corner at the intersection. From there down towards the Fire Department the light in front of the library is out. There is just one on each corner, there is none between there. They are out. There are quite a few trees on each side of that street."
Kay Norton, a member of the State Guard, testified: "The State Guard was in session a little longer than usual at the armory, and we had about thirty minutes to take our drill. We went down and formed a company and marched down North Main Street for nearly a block, and executed the rear march and came back south, and that is the time we were run over. I was leading my squad on the inside of the curb going down, and executed a rear march which threw me in the rear coming back. When they executed the rear march, that threw J. D. Bridges on the front of the back towards town. We were marching in south direction towards town. The car that hit Mr. Bridges came from north behind the column of squads. At the time Mr. Bridges was run over the company was going in same direction the automobile was going. The automobile *Page 85 
overtook the squad. We were going at the rate of about five miles per hour. There were two complete columns of soldiers and three to the left, a staggered column on the left next to the center of road. There were three columns — one column only had three men in it. That column had something like twenty-six men — we threw them together. We generally worked them in separate squads, but there were some absent, and we threw them into columns, one, two, and three squads, you might say three men right next to the street. Going south we were on the right side of the street, I would say within about three feet of the curb. I was on the inside next to the curb. I was the last man on the rear, and they had something better than twenty-five men marching in front of me. Going down, I saw the car. When we were going down I saw the car in the third block, had two dim lights burning, and he was going at not a rapid speed, very normal rate of speed, maybe a little better than fifteen miles per hour. He was in the third block from me. There were lights there — white-way lights were on each side of street. Before I got to where I could walk, I had them carry me down there to clarify in my mind that there was no obstruction to prevent anybody seeing. Anybody that could see to drive could see anybody on the street walking. This was at the time the ban was on pleasure driving, and there were no cars traveling on the street at the time this car struck us in that section or end of town. I got hit, very muchly so. As I said before, we didn't have but a short time to drill; and we went down and formed the company and went down Main Street towards the depot. Just before we got to the intersection of Church and Main we executed the rear march. I was in the lead. That threw me to the rear of the line when we executed rear march, and coming back up we hadn't gotten but half of the block back when this car struck me. I was the first one hit, and then it just ran right on over me some way. . . And the car continued right on through, never did stop. Mr. Bridges was struck, I would say, forty to fifty feet from where I was struck. It drug Mr. Bridges from the place it hit him, I should say, about three hundred feet — two hundred and fifty to three hundred feet. The impact almost stopped the negro. In other words, you get fifteen or twenty men in an impact, it will almost slow him to a standstill, until he had to do something to *Page 86 
get out. If he had left the automobile it would have stopped itself. . . There are some trees on each side of the street. I don't know whether there is a light in front of the library. I never noticed. There are two lights on each side of Church Street. The white way is on Main Street there at the Hall. There are lights all the way through town. Any object going along there with those lights you can see it six blocks. . . We didn't put out a guard to watch traffic while marching. . . Very seldom you saw a car that night while we were out. It was between nine and ten o'clock when it happened. . . I didn't see a shotgun sticking in the windshield. I didn't see the way mine went when he hit me. It might have gone through the windshield, but when he hit me my gun went somewhere. I don't know where it went. . . I imagine the bumper hit me. I didn't see what part of it hit me, but when it hit me there was no warning whatever."
Jack Duskin testified: "I was there at the time Mr. Bridges was killed. I was not in line. . . I was not drilling with the company at the time. I am a member of the Home Guard. We had the company that night divided into platoons. Sergeant Pace was drilling one platoon and Sergeant Marshall was drilling the platoon that got run over. I had been down with Sergeant Pace around there near the Ford Motor Co. and was coming back, and this other platoon when the accident happened I was walking in that direction. The first thing I saw or knew I saw that something was wrong and guns flying through the air and some of them yelled, and somebody holloed `Stop him,' and as near as I could tell the car was approximately — the head of the column had apparently slowed them from the force of hitting the men, whatever it might have been, and was practically at a standstill. . . Apparently he changed the gears. I didn't see him change gears, but from the action of the car I would say that is what was done, and stepped on the gas, cutting cater-cornered across the street to turn in at the corner by the Fire Department. Had I not jumped I think he would have run over me. . . There was over half of the street not taken up by the column. I could see the soldiers marching down there. . . From the head of the column, from where I was standing, it was probably fifty years. I did not go out to where the car was. I was busy working with the fellows that were hurt." *Page 87 
Zeb Marshall testified: "I was sergeant in the Home Guard. . . Mr. Bridges was right up toward the front end. . . I saw this car when it was about a block away from us before it hit me. At that time we were going meeting the car. We reversed, though, at that time, and came back the other way. It was about a block away when we reversed. At that time we were marching north, and the car was coming south. We reversed and started marching south. We had gotten a little over a half block before car hit me. We were between two street lights. I saw the car right at the intersection of Farmers Exchange. We were there. I would say the car was coming along about at Hill's store. We turned and started marching south, the same way the car was going. We were marching, I would say, about four feet from the curb on the right hand side. . . We got along about in front of the library, and something hit the back end. I didn't know what it was at the time. I didn't realize what it was; but before I could turn around to see, it hit me. I could tell it was a car that hit me, and I was knocked down, and by the time I could get up the car was about in front of the Fire Department and just making a turn to go around that curve, and Sergeant Duskin was out in the street trying to stop it, but he didn't succeed in stopping it. It went on around the corner. . . It was about ten minutes until ten o'clock that night. We did not have a `lookout' there. We don't have one now all of the time. We have had them since that accident. . . I didn't mean we were between the lights where Church Street intersects and crosses Main on each corner there and the lights down a block from there. As well as I remember, there is a light in front of old Standard Oil Company, and down — up north before you get to the corner where the Farmers Exchange is located. We were right along about the library when the accident occurred. I don't remember, but I don't think there was a light in front of the library. There was not a light where we were hit. There are trees on the right-hand side of Main Street going north. I don't remember about on the left-hand side. We were marching south on the right-hand side of the road when we were hit, and the car was traveling south on the right-hand side of the road. . . I don't know how wide that street is. I would say about thirty or thirty-five feet. . . That was the only car in the street at that time being operated." *Page 88 
Bobby Ross testified: "I am a member of the Home Guard. . . I was not in the company in which he [Bridges] was killed. I was in the company in front of Mr. Charlie Matthews' filling-station right by the side walk. Mr. Pace was my sergeant. I heard the collision. I was at the corner of the Fire Department, and it occurred about half-way down the block. I would say it was about thirty or forty yards. When I heard the collision I looked that way. I didn't see anything but the car running through them. I don't know how many of them it ran over. I never did go down there. I tried to jump on the back of the car as it turned the corner, and stop him, and he wouldn't stop. . . They did not stop when they hit up there — they continued on. They were on the right-hand side of the street coming south when they hit the soldiers. There was plenty of room on the left-hand side of the street for the car to pass coming in the same direction they were going. I would say that street up there is between twenty-five and thirty-five yards wide."
Jesse Chambless testified: "I was near the front of the line in the squad when hit, probably three or four men back in what we call the middle file. There were two full files and part of another one. Probably three men, I would say, in the third file, and I was in the middle file. I would say the line was eight to ten men long — ten long. Mr. Bridges was near the front of the column marching south; probably the front man, but I am not positive. He was in front of me. I was about the third man from the front. Mr. Bridges was in front of me. He was further south than I was. I would say that street was forty to forty-two feet wide, probably. I did not see the car before it hit me. I had not seen or noticed the car before we reversed. I didn't hear the car coming up back of me. I didn't hear it until it hit the rear of the squad. I was on the right-hand side of the street going south, which would throw me on the left of the curb. There was a man between me and the curb. . . When the car hit in the rear it came right on through the line, and it drug just a few feet and skinned and bruised me about the legs and ankles. That car did not stop. . . I did not see the car when it hit Mr. Bridges. I was on the ground at the time. It would be hard for me to say how many people it knocked down that night. There was a good many. I would say at least seven or eight or ten were on the ground when *Page 89 
I was first in position to see. May have been more than that, but there was at least that many stayed on the ground for a good while. It was about twenty to twenty-five feet from the front man to the back man. . . I saw this car continue on. I don't recall whether it speeded up. It just about knocked me out, and I know it went right on through; but I couldn't tell you about the speed, whether he speeded up or not. He was not running so very fast when he came into us. I would say the nearest man to the curb was not more than four feet, and I was probably not more than six feet. . . There were street lights both behind us and in front of us. You could see out there plenty good. The car was not running so very fast, I would say not more than twenty to twenty-two miles an hour, probably, from appearance. It came up behind me. I couldn't tell you definitely, but he was not running so fast I wouldn't think. . . I imagine two thirds of the street was left for him to go any way he wanted to. . . We didn't have a lookout. No one to look out for traffic. The lights are on each side of the street at the intersection of East Church Street and Main Street. Seems to me there is a light near the middle of the street. I am not positive about that. There is a light in front of the library, but I don't know whether it was burning that night or not. I haven't ever noticed whether the globe is off of it or not. I would estimate that street is some forty feet wide. . . I did not see a shotgun sticking in the windshield of the negro's car. . . We all had unloaded shotguns."
C. H. Oliver testified: "I am a member of the Home Guard. I was in the bunch drilling, but was in a bunch off from this squad. I did not see the car when it hit a column being drilled by Mr. Zeb Marshall. The commotion and sound of the impact attracted my attention. I looked at them when I heard the impact. When I looked that way, the car was coming through the squad and knocking men right and left, and came on out, and Jack Duskin tried to stop it, and it ran into him and he jumped out of the way, and it came around, and a man was hanging on the car and turned the corner at the Fire Hall, and about twenty feet after the car turned the corner Mr. Bridges fell off or came loose, and the negroes went on. Mr. Walter Childress ran up with an automobile about that time, and he says, `Mr. Oliver, lets get in here and catch them,' and Mr. Childress and myself got in the car with Bobby Ross and *Page 90 
a little Miller boy, and we went out after them and followed them until they stopped along the side of `96' at a little juke joint out there, and they hopped out and ran. We tried to catch them but they got out of sight, but we did capture two girls. . . I did not measure from place Mr. Bridges was hit to the place that he was found. I imagine it was about three hundred yards. I did not see this car make any effort to stop. I did not. After he got through that column he lit out. It took all we could do to overtake him. I can't say positively how many people got hurt there that night. There was fourteen or fifteen I understand."
Raymond Lee testified: "I knew Mr. J. D. Bridges. I was in the squad drilling with him, the night he was killed. I was right back of Mr. Bridges. Wasn't anybody in front of Mr. Bridges; he was head of the line. I had not seen this car before it hit. We went out to drill for a few minutes; we didn't have much longer to meet. We drilled down Main Street, almost down to Jack Duskin's place; and they gave orders to the rear march, and that threw Mr. Bridges on the front line when we turned around and started back south. He was on the inside to the curb, I imagine about three feet to the curb, and I was right behind him. I heard something hit the line; by that time something hit me and knocked me to the right, and the car hit me on the legs and Mr. Duskin came running up there hallooing and waving to stop; and he must have changed the gear or something, because the wheels were spinning, and cut in toward Mr. Jack, and Mr. Jack jumped out of his way, and he went on out by the Fire Department, and somebody started after him. I asked where was Mr. Bridges, and somebody said he was over there by the side of the Fire Department; and I went around and saw him lying there. . . I did not measure the distance from where he was hit to where he was found. I couldn't say exactly how far it is, but I would say between two hundred fifty and three hundred feet."
Frank English testified: "I know the street where J. D. Bridges was killed. I have the width of that street. It is forty-two feet from curb to curb. . . I measured the street right in front of the library. . . Right in front of the library is forty-two feet. I understand that is where the accident occurred. I didn't see it. I know where East Church Street is. There is a light on each side there as it intersects Main Street. There is one light between *Page 91 
there and the end of the block down about the Fire Department. There is a light-post in front of the library. I don't know whether there is a light there or not. I think a globe is on it. I didn't pay any attention to the light. I wouldn't be positive about the globe, but I think it was there. I have never noticed at night that there is a dark reflection on the street there about where this accident occurred about the library, I never paid any attention to that. On the east side the trees are thick. There are no trees on the west side, but there are on the east side. The trees extend over the road some; the branches do."
E. J. Pace testified: "I am a member of the Home Guard. I am sergeant of one platoon. I recall in February of this year when Mr. Bridges was killed. I was drilling that night with the Home Guards. I was not in the same platoon Mr. Bridges was in that night. I was approximately two hundred feet from the Bridges platoon. I did not see this car when it collided with Bridges' platoon. My attention was attracted by the sound and noise. I looked up that way when I heard the noise. I got a vague view because I was on the south end of my platoon, and of course this is a little detail; but we had gone by the right flank. We were marching in line with my right flank. That threw me to execute a movement to turn to the south, and I had been facing east; and then everybody moved of course, and that put all of my men kinder between me and the car, but I could see a vague commotion up about the spot where the accident occurred. The accident occurred on Main Street right across from the library; the way I remember now there was a light pole about where they showed me about where they were when they hit, but I got in my car and ran after. I do not know whether a negro or who hit; but I tried to catch the car, but it had gone. . . There were lights all up and down the street — street lights on the corners of the street. We had drilled a little while there. I wouldn't think there was anything to keep you from seeing. We were walking. I have never noticed in driving an automobile along there whether the vision is good or not. I was down in front of Matthews filling-station. I wasn't down where the accident occurred. The accident was about in front of the library — below the Fire Department. . . Of course when they are drilling they must take up around twenty-five or thirty feet. The only lights I recall were on the corner where Church *Page 92 
Street intersects Main Street and down at this end of the block. I don't think the light in front of the library is burning. It was not burning then. They just have the lights at the corners. They don't use those middle lights much now. I noticed whether this car had lights or not. At first I couldn't see any lights, and I wondered what had happened. Of course it was that quick. But there was men moving in front, and just at the time it hit I looked around and men were moving around, but I saw lights. I don't know whether one or two. We broke the head off the car trying to stop the car. The car had lights on it; there was one light at least, I know."
The defendant made his statement, as follows: "I was taught by my mother and my father to tell the truth, regardless of what it was. I was riding along about ten — about fifteen or twenty miles an hour, and the reflection of the trees had the road shaded. I didn't see them. After I had hit them and when it happened a shotgun stuck through the windshield and hit me in the face. That is why I run. I wouldn't have hit them for nothing in the world if I had seen them; and that is why I run, the shotgun coming in through the windshield. I was not drunk, because I had not drunk nothing since about four o'clock that afternoon. Four of us drunk a pint of whisky together about four o'clock that afternoon, but I was not drunk. I just didn't see them; so I want to ask the grand jury and this court and all of the white people to please have mercy on me. I had been over to Beulah Church. I was coming from Beulah Church to take this girl back home. That is why I had been to Beulah Church."
Witnesses Duskin and Norton were recalled by the State. Duskin testified: "I didn't see any shadow out there that would obstruct any vision where the boys were drilling that night where Mr. Bridges was killed. It was night. I don't recall any shadow. I don't see how there would have been at night. I don't recall whether I saw a shadow. I would say there was no shadow. I was as far from the accident as those posts back there. I don't recall but I would say there was a street light burning at the corner of the street or block. There was no light burning directly in front of the library. The accident occurred approximately there on the other side of the street. . . There are trees on the east side of the street. The branches hang over the street somewhat. *Page 93 
They don't hang all the way across the street. Most of the trees are on the opposite side of the street from where the accident occurred The accident happened between the street lights on the corner of East Church Street and the corner. I don't know the length of the block I would say offhand that it would be two hundred fifty or three hundred yards. It was about the middle of the block where it happened; it was a little nearer to the south end of it."
Kay Norton, recalled, testified: "I did not see any shadow there that night over the street when I was hit and Mr. Bridges killed. There is no obstruction on that side of the street. On the other side of the street the trees are overlapping the sidewalk, but the trees don't even extend out on the other sidewalk of it that we were on. No shadow there. You could see a man sitting on the ground if he didn't have any car lights at all."
One of the grounds of the motion for new trial is that the verdict is strongly and decidedly against the weight of the evidence. This, however, must be addressed to the trial judge. Code, § 70-206. The law gives to him alone the authority to grant a new trial for such a reason. This court has no such power. "The Supreme Court shall be a court alone for the trial and correction of errors of law." Constitution, art. 6, sec. 2, par. 5 (Code, § 2-3005). Under the general grounds usually contained in such a motion, it is a question of law whether the verdict is contrary to the evidence and without evidence to support it. This court passes, not on the weight, but the sufficiency of the evidence. We are therefore to determine in this case whether the verdict as rendered, coming to us with the stamp of the approval of the judge, can be sustained under any view taken of the proofs submitted to the jury.
The jury could have found from the evidence in this record that the accused shortly before ten o'clock at night, after admittedly having drunk some whisky about four o'clock that afternoon, on the public streets of the City of Dawson, with electric lights shining at each street intersection, did, when about midway the block, driving his automobile at the rate of about twenty miles an hour, *Page 94 
with the lights on his car permitting him to see the objects directly in front of him, deliberately or recklessly run into a body of troops in front of him, marching in the same direction; that he drove through this body of men, knocking ten to fifteen of them down, and finally ran against Bridges, who was forty or more feet from the rear of the squad into whom he ran his car, killing him; that he did this without any warning, and without any effort to stop his car, or to slow down, or to drive around them, or to do anything else to avoid hitting them. The jury were authorized to regard such conduct as evidencing a wanton and reckless state of mind which is the equivalent of a specific intention to kill, when death results as it did in the instant case, and accordingly to grade the crime as murder. CompareMarshall v. State, 59 Ga. 154; Gallery v. State,92 Ga. 463 (17 S.E. 863); Cook v. State, 93 Ga. 200
(18 S.E. 823); Hamilton v. State, 129 Ga. 747 (59 S.E. 803). The judge gave in charge the various grades of homicide, including that of involuntary manslaughter. The jury were evidently of the opinion that the case was not one of mere negligence, but that the act of the defendant that brought about the death was done so carelessly and recklessly that the law would imply an actual intention to kill. We are not called upon to say whether, had we been in the place of the jury, we would have found the accused guilty of a lesser offense. It was their province to put their own appraisal upon the proofs submitted to them. Their verdict, from a legal standpoint, was justified; and the trial judge, in the exercise of that discretion which the law places in his hands, having denied a new trial, the judgment must be
Affirmed. All the Justices concur, except Duckworth andAtkinson, JJ., who dissent.