539 A.2d 664

**In re PETITION FOR WRIT OF PROHIBITION and/or a Writ of Mandamus or Other Appropriate Relief.**

**Misc. No. 27 Sept. Term, 1986.**

Court of Appeals of Maryland.

April 8, 1988.

Valerie V. Cloutier, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and JAMES F. COUCH, JR., Associate Judge of the Court of Appeals of Maryland (Retired), Specially Assigned.

ADKINS, Judge.

At issue here is this Court's power to issue one of the extraordinary writs—mandamus or prohibition—to a circuit court judge. The State asks us to issue one of the writs because the circuit court judge granted a jury-convicted

defendant's motion for new trial, an action from which no appeal lies. *Dean v. State*, 302 Md. 493, 499–500, 489 A.2d 22, 25–26 (1985). If we can cross that threshold, a second question is whether a circuit court judge may grant a new trial in a criminal case, thereby setting aside the jury's verdict, because the judge does not credit the testimony of the chief prosecuting witness. And if we conclude that we have authority to issue one of the extraordinary writs, we also must decide whether this is a case in which an extraordinary writ should issue. To set the stage for our consideration of these matters, we recount the earlier proceedings in this case.

## I. *Background*

On 19 and 20 May 1986 Paul Joseph Katz was tried by jury in the Circuit Court for Montgomery County (Miller, J., presiding) on charges of attempted robbery with a dangerous and deadly weapon, assault with intent to rob, and simple assault. At the close of the State's case, and at the close of all the evidence, Katz moved for a judgment of acquittal. Judge Miller denied the motions. The jury returned a verdict of guilty on all counts.

Katz moved for a new trial on five grounds. The first four grounds may be summarized as involving unfair surprise, newly discovered evidence, improper jury instructions, and jury misconduct. Katz also alleged that the jury verdict was "contrary to the evidence," and, in effect, that it was against the weight of the evidence. He based these allegations in large part on the State's failure to call Rodney Hall, the victim, as a witness.

On 28 July 1986 the new trial motion was considered. After arguments by counsel Judge Miller discussed Katz's first four grounds and found no error justifying the grant of a new trial. Neither counsel nor the judge specifically addressed the "contrary to the evidence" argument, but in granting the new trial motion, the judge went on to say,

> The only question the Court has is whether or not the Court ought to exercise its discretion in granting a new

trial, or whether the Court feels in any way that some injustice may have been done, and whether this is an appropriate case to exercise that discretion.

There are some things, and certainly through no fault of the State, is the inability of the State or the defense to produce Rodney Hall. The State had to rely upon the testimony of Brian Conway. It became a question for the jury basically of the credibility of Brian Conway as against the credibility of Paul Katz. The jury after considerable deliberation decided that it apparently felt that Mr. Conway's testimony was more credible, and that Mr. Katz's testimony should not be given credence.

As I indicated, there are some matters that do disturb the Court. . . .

Given all matters in this case, and as reluctant as the Court is to upset or disturb a jury's finding, there [are] enough things that do disturb me that I feel that I am going to give the defendant a new trial.

The Assistant State's Attorney requested that the judge place his reasons for granting the motion on the record. The judge replied:

I just think that there are enough things that disturb me as to whether or not there is at least a possibility of some injustices. It in no way involves the State's conduct in the matter. There is no impropriety on the basis of the State in this case. I just feel that it is a disturbing case, one that disturbed me about the verdict, and given that fact I am going to exercise my discretion in granting a new trial.

On 19 February 1987 the court heard argument on the State's motion to reconsider the order granting a new trial. Judge Miller clarified his reasons for that action.

What truly troubles me is I was faced with the prospect of sentencing somebody that I was not convinced was guilty. I understand, and I do not substitute my judgment for the jury, and I do not know—new trial I have granted. It certainly [is] no reflection on the State, as I

indicated, nor is it on anything the State has done or the jury.

I understand it was a credibility issue, but that is the posture that I was in, and I have some grave reservations about what has happened, and it is a matter of [conscience] and I do not like to substitute my judgment for the jury, but they do not have to sentence Mr. Katz, and I did, and it troubled me.

The case troubled me, it still does. If another jury convicts him, and if somebody else has to sentence him, that is fine, but I just—it just troubles me too much, and that is the reason that I granted a new trial.

\* \* \* \* \* \*

... I guess to some extent the judge is a 13th juror in some cases, and that should not be in many, but in this one I think it is appropriate, and I just felt that—given all things considered, I am not prepared to sentence, and I think he ought to have a new trial. I did then and I do now. As I say, I cannot articulate [a] good reason, but I just feel that it is appropriate.

The State, conceding it cannot appeal the new trial order, petitioned this Court for "a writ of prohibition and/or a writ of mandamus ... directing [Judge] Miller to vacate the order granting a new trial ... and to proceed with the sentencing of Katz...."

## II. *Prerogative or Power to Issue Extraordinary Writs*

The State asserts that our authority to issue a writ of mandamus or prohibition arises from what it characterizes as our supervisory or superintending power over lower courts—a power it believes to involve an exercise of appellate as opposed to original jurisdiction. Additionally, the State points to Art. IV, § 18, of the Maryland Constitution concerning the rule-making authority of this Court and establishing the Chief Judge as "administrative head of the Judicial system of the State." Katz, on the other hand, denies that Art. IV, § 18, confers superintending control over the judicial decisions of lower courts, and avers that

the power to issue prerogative writs, under the circumstances of this case, involves the exercise of original jurisdiction—a jurisdiction this Court lacks. Before we review these arguments in detail it will help to examine, in summary fashion, the history and nature of mandamus and prohibition at common law.

### A. *The Common Law Writs of Mandamus and Prohibition*

A writ of *mandamus* is, in general, a command issuing in the king's name from the court of king's bench, and directed to any person, corporation, or inferior court of judicature, within the king's dominions, requiring them to do some *particular* thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant with right and justice. It is a high prerogative writ, of a most extensively remedial nature. . . .

3 W. Blackstone, *Commentaries on the Laws of England* 110 (facsimile ed. 1768; hereinafter Blackstone) [emphasis in original].

The same author describes prohibition as

a writ issuing properly only out of the court of king's bench, being the king's prerogative writ . . . directed to the judge and parties of a suit in any inferior court, commanding them to cease from the prosecution thereof, upon a suggestion that . . . the cause . . . does not belong to that jurisdiction, but to the cognizance of some other court. . . . [The writ also may issue] if, in handling of matters clearly within their cognizance, [the inferior courts] transgress the bounds prescribed to them by the laws of England. . . .

*Id.* at 112.

These writs were two of the common law prerogative or

extraordinary writs [1] that issued out of the Court of King's Bench. And the evolution of that court tells us much about the writs themselves, and the power of a court (absent constitutional or statutory authority) to issue them.

In its earlier days at least, the King actually sat in the Court of King's Bench, as by later fiction he was supposed to have done. 1 W. Holdsworth, *A History of English Law* 207 (7th ed. 1956) (hereinafter 1 Holdsworth). Moreover, in the medieval period, the court was closely connected with the Council. *Id.* at 209. "[T]he Curia Regis was a large undifferentiated court, composed both of the leading nobility lay and spiritual and of royal officials, by means of which the king carried on all the business of the central government—judicial, legislative, and executive." *Id.* at 477 [footnote omitted]. The notion of separation of powers—even today somewhat foreign to British constitutional law—simply did not exist. Thus this body exercised broad supervisory authority over subordinate officials, judicial and otherwise, probably without paying much heed to whether a particular act of supervision was judicial or administrative in nature. It exercised this authority in part through the prerogative writs. *Id.* at 226.

As time passed and government became more sophisticated, or at least more complex, these arrangements began to change. Thus, towards the end of the 14th Century, the Council was becoming "more especially the organ of the executive side of the government, and Parliament of the legislative side; while the court of King's Bench was tending to become simply a court of common law, which was concerned with the judicial side of government." *Id.* at 210 [footnote omitted]. But despite this metamorphosis, the court

> preserved both in its style and in its jurisdiction traces of the days when it was a court of a very different kind. In

---

**1.** The others were habeas corpus, certiorari, quo warranto, and ne exeat regno. 1 W. Holdsworth, *A History of English Law* 226–231 (7th ed. 1956) (hereinafter 1 Holdsworth).

its wide powers of control over other courts and officials, and in its wide criminal jurisdiction, it retained powers of a quasi-political nature which came to it from the days when the court held coram rege was both King's Bench and Council.

*Id.* at 211.

Thus when King's Bench became established as a common law court, it had original jurisdiction and appellate jurisdiction in both civil and criminal cases. And it had "a general superintendence over the due observance of the law by officials and others." *Id.* at 212. As we have seen, it was generally in the exercise of this power that it issued the prerogative writs. In the 16th and 17th centuries, for instance, "[b]y means of these [prerogative] writs ... [and by other means] the doings of the justices of the peace, of the borough Courts, of courts leet, and of parishes were frequently controlled; and rules were laid down for the guidance of these authorities on points of law and procedure." 5 W. Holdsworth *A History of English Law* 420 (3d ed. 1945).

### B. *Mandamus and Prohibition in Provincial Maryland*

The 17th century, of course, brings us to the Province of Maryland and affords us an opportunity to glance at relevant aspects of our pre-revolutionary governmental structure. In that period judge-made common law prevailed to some degree in Maryland, subject to such Provincial legislation as was enacted, and to pertinent acts of Parliament. In those early days, arrangements were not unlike those in medieval England. The Governor sat with his Council and this body performed administrative, legislative, and judicial functions. C. Bond, *The Court of Appeals of Maryland* 1–3 (1928) (hereinafter Bond).[2] By 1638, the Governor and

---

2. For more extensive treatment of judicial and other governmental arrangements in early Maryland, *see* J. McMahon, *An Historical View of the Government of Maryland* (1831); N. Mereness, *Maryland as a Proprietary Province* (1901); J. Thomas, *Chronicles of Colonial Mary-*

Council were sitting as a county court, which by 1642 was designated the Provincial Court. *Id.* at 3–4. After the division of the legislature into upper and lower houses in 1649, the upper house (the Governor and Council) exercised the highest appellate authority in the province. *Id.* at 3. But the Provincial Court "became the chief court of the province, regarded as the local equivalent of the Court of King's Bench." *Id.* at 4. Like King's Bench, it exercised both original and appellate jurisdiction. *Id.*

Pre-revolutionary sources show that the Provincial Court as well as the Court of Appeals issued the extraordinary writ of mandamus on occasion.[3] *See Bordley v. Lloyd,* 1 H. & McH. 27 (Prov.Ct., June Term 1709); *Mitchells Adrs. v. Majsty* (1715) reported in C. Bond, *Proceedings of the Maryland Court of Appeals 1695–1729,* 196–197 (1933). But the cases themselves fail to discuss the source of the power to issue these prerogative writs.

Post-revolutionary authorities, however, assert that the Provincial Court possessed the supervisory or superintending power of the Court of King's Bench. In *Kendall v. United States,* 12 Pet. 524, 9 L.Ed. 1181 (1838), for reasons not important here, it became necessary to decide whether the federal Circuit Court for the District of Columbia had the power to issue a writ of mandamus. Important to that determination was the question of whether Maryland courts had common law power to issue the writ in 1801. Both the majority opinion of Justice Thompson, *id.* at 621, 9 L.Ed. at 1219, and the dissenting opinion of Chief Justice Taney, *id.* at 631–632, 9 L.Ed. at 1223–1224, concluded

---

land (1913); M. Wichers, *The Administration of Justice in Colonial Maryland 1632–1689,* (1979).

**3.** The Court of Chancery also issued a number of these writs in the late 17th century. Typically the court issued writs of *mandamus* in cases where land was escheatable to the proprietary. In these cases the writ would issue directing county officials to conduct an inquiry into the amount and value of the land. Wichers, *supra,* at 117. The Chancery Court, primarily a court of equity, had both original and appellate jurisdiction. *Id.* at 111–131.

that the Maryland General Court had that power. The General Court was the successor of the pre-revolutionary Provincial Court. *See,* Md. Const. of 1776, § 56; *and see* Bond, *supra,* at 58. What Chief Justice Taney had to say is instructive.

After discussing the power of King's Bench to issue prerogative writs as an incident to its superintending power, Taney asserted that the Provincial Court possessed this power because its jurisdiction was co-extensive with the dominions of the lord proprietary and because the Provincial Court was to Maryland what King's Bench was to England at common law. *Kendall,* 12 Pet. at 630–632, 9 L.Ed. at 1223–1224. In Taney's view this power passed to the General Court in 1776. *Id.* And this view is supported by *Runkel v. Winemiller,* 4 H. & McH. 429 (Gen.Ct.Oct. Term 1799).

At issue in that case was whether the Reverend Mr. Runkel was entitled to a writ of mandamus to oust William Schneyder, who had allegedly usurped Runkel's position as the lawfully installed minister of the "German or High Dutch Reformed Christian Church" at "Frederick Town." *Id.* at 430–431. The General Court held it had the power to issue the writ. It explained:

> The Court of King's Bench having a superintending power over inferior Courts of jurisdictions, may and of right ought, to interfere to supply a remedy when the ordinary forms of proceedings are inadequate to the attainment of justice in matters of public concern.... *The position that this Court is invested with similar powers is generally admitted,* and the decisions have invariably conformed to it; and whence the inference is plainly deducible, that this Court may, and of right ought, for the sake of justice, to interpose in a summary way to supply a remedy where, for the want of a specific one, there would otherwise be a failure of justice.

*Id.* at 449 [citation omitted; emphasis supplied]. As we have seen the General Court was the successor to the Provincial Court; this, then, amounts to a statement that

the Provincial Court had the superintending power and consequently the power to issue prerogative writs.[4]

It also was Chief Justice Taney's view that the Provincial Court possessed the supervisory or superintending power of King's Bench. *Kendall v. United States, supra,* 12 Pet. at 629, 9 L.Ed. at 1222–1223. If that is so, has that power, or any part of it, passed to this Court, and if so, by what means? If not, is there some other basis for our issuance of writs such as mandamus and prohibition?

### C. *The Court of Appeals and Mandamus and Prohibition*

#### 1. *Introduction*

From the preceding discussion we may assume that the common law power of the Court of King's Bench to issue prerogative writs was possessed by the Provincial Court and passed to the General Court. This is consistent with the authorities we have cited and with the notion that the mandamus and prohibition powers ordinarily reside in the highest court of original jurisdiction.[5] F. Ferris, *The Law of Extraordinary Legal Remedies,* §§ 219, 220, 328 (1926). Whether this Court has that power is the question to which we now turn.

---

**4.** The General Court had alternative ways of compelling lower courts to comply with its commands. In *State v. Stone,* 3 H. & McH. 115 (Gen.Ct.Oct.Term 1792), the justices of the Charles County Court were held in contempt for failing to obey a writ of certiorari issued by the General Court.

**5.** That the Court of Chancery issued mandamus is not inconsistent with this theory, since it was the highest court of original equity jurisdiction. The issuance of mandamus on at least one occasion by the pre-revolutionary Court of Appeals (n. 3, *supra,* and accompanying text) does seem inconsistent. The writ was issued to the Provincial Court, and conceivably may have been used in aid of the appellate jurisdiction of the Court of Appeals. *Mitchells Adrs. v. Majsty* (1715) reported in C. Bond, *Proceedings of the Maryland Court of Appeals 1695–1729,* 196–197 (1933). In any case, as we shall later see, constitutional developments in Maryland indicate that the post-provincial Court of Appeals did not necessarily possess the identical jurisdiction as its predecessor.

Of course, a court may be granted mandamus or prohibition power by express constitutional or legislative grant. A court may also have that power if it exercises, by express grant or otherwise, the superintending powers of King's Bench. Finally, there is authority to the effect that a court exercising appellate jurisdiction may issue the writs in aid of that jurisdiction. Do any of these principles support the conclusion that this Court has authority to issue prerogative writs?

We can quickly dispose of any notion of an express grant. The Maryland Constitution is silent as to any mandamus or prohibition power in this Court. The only general statutory provision dealing with mandamus jurisdiction is Md.Code (1984 Repl.Vol., 1987 Cum.Supp.) § 3–8A–01 of the Cts. & Jud.Proc. Art.; it relates only to the circuit courts.[6] Nor is there any express grant of superintending power to this Court.[7] Whether we have, as the highest court of this

---

**6.** This statute is a successor to Ch. 90, Acts of 1806, § 9 which transferred to the county courts "all and singular the powers, authorities and jurisdictions, which the general court, at the time of the abolition thereof, might or could have used or exercised in cases of writs of *mandamus....*" [Italics in original.] It was necessary because of the abolition of the General Court by the constitutional amendment proposed by Ch. 55, Acts of 1804, § 6. *See Kendall v. United States,* 12 Pet. 524, 632, 9 L.Ed. 1181, 1224 (1838) (Taney, C.J., dissenting). *And see Harwood v. Marshall,* 9 Md. 83, 97 (1856).

**7.** Twenty states expressly give their courts of last resort superintending or supervisory power over inferior tribunals. Some do so by express constitutional grant. *See* Ala. Const. Art. VI, § 6.02 (1973); Ark. Const. Art. 7, § 4; Colo. Const. Art. VI, § 2 (1965); Iowa Const. Art. 5, § 4 (1857, amended 1962); Ky. Const. § 110(2)(a) (1891, amended 1976); La. Const. Art. 5, § 5(A); Mich. Const. Art. 6, § 4; Mo. Const. Art. 5, § 3; Mont. Const. Art. VII, § 2; N.M. Const. Art. VI, § 3; N.C. Const. Art. IV, § 12(1) (1981); N.D. Const. Art. VI, § 2 (1976); Okla. Const. Art. VII, § 4 (1967); S.D. Const. Art. 5, § 12 (1972); Wis. Const. Art. 7, § 3 (1977); Wyo. Const. Art. 5, § 2. Others have done so by statute, *see* Haw.Rev.Stat. § 602–4 (1984 Repl.Vol., 1987 Cum.Supp.); Kan.Stat.Ann. § 60–2101 (1983 Repl.Vol.); Mass. Ann.Laws Ch. 211, § 3 (Law.Co-op.1986); N.H.Rev.Stat.Ann. § 490:4 (1983 Repl.Vol.). Such a grant of power carries with it the authority to issue prerogative writs. *See e.g. Duke v. State,* 288 Ala. 538, 540–541, 263 So.2d 170, 172 (1971); *State ex rel. Purcell v. Nelson,*

State, an inherent superintending or supervisory power over the courts below us in the judicial hierarchy, and whether any such power is implicit in Article IV, § 18 of the Maryland Constitution, are questions we reserve for another day. We need not and do not address them today because we hold that under the circumstances of this case we have the power to issue a writ of mandamus or a writ of prohibition in aid of our appellate jurisdiction.[8]

### 2. *Mandamus and Prohibition in Aid of Appellate Jurisdiction*

■ As the preceding sections (A and B) of this opinion show, certain courts, both in England and in Maryland, could issue writs of mandamus and prohibition in exercise of their original jurisdiction. We cannot claim the power to issue those writs on that basis, for we are a court of appellate jurisdiction only, as we have held consistently since *Ex Parte O'Neill*, 8 Md. 227, 229 (1855). *See Shell Oil Co. v. Supervisor*, 276 Md. 36, 40–43, 343 A.2d 521, 524–525 (1975); *Board v. Attorney General*, 246 Md. 417, 427, 229 A.2d 388, 393 (1967). The cases are cited in *Shell Oil*, 276 Md. at 42, 343 A.2d at 524, where Judge Eldridge, for the Court, quoted *Sevinskey v. Wagus*, 76 Md. 335, 336, 25 A. 468, 469 (1892) to the following effect:

This Court is an appellate court, and is so styled in the Constitution; and no provision is made in that instrument for instituting or conducting any original proceedings

---

*Berry Petr. Co.*, 246 Ark. 210, 215, 438 S.W.2d 33, 37–38 (1969); *State ex rel. O'Connor v. District Court*, 219 Iowa 1165, 1169–1170, 260 N.W. 73, 75 (1935). *And see* F. Ferris, *The Law of Extraordinary Legal Remedies*, §§ 220 and 328 (1926).

**8.** Article IV, § 18(a) of the Maryland Constitution deals with the rule-making power of this Court. Subsection (b) establishes the "Chief Judge of the Court of Appeals ... [as] the administrative head of the Judicial System of the State" and his administrative authority. In *State ex rel. Sonner v. Shearin*, 272 Md. 502, 520, 325 A.2d 573, 583 (1974), we left open the question of whether the latter provision authorized us to issue a supervisory writ of mandamus. As indicated, we again leave open that question, as well as the effect, if any, of all of § 18 with respect to the issuance of prerogative writs.

herein. The Constitution, Art. 4, sec. 14, in defining the jurisdiction of this court, declares, that "The jurisdiction of said Court of Appeals shall be co-extensive with the limits of the State, and such as now is or may hereafter be prescribed by law;" that is to say, such appellate jurisdiction as the court then had or might thereafter have conferred upon it. The court at the time of the adoption of the present [1867] Constitution had, under former Constitutions, appellate jurisdiction only; and the terms by which the jurisdiction is defined in the present Constitution, are substantially the same in meaning as those employed in the Constitutions of 1851 and 1864. It would therefore seem to be clear that the jurisdiction of this Court is appellate only; for if not so, and the Legislature could confer original jurisdiction upon it in cases of *habeas corpus,* it could also confer such jurisdiction in cases of *mandamus,* or in cases of any other subject-matter of original jurisdiction.

*Shell Oil,* 276 Md. at 41, 343 A.2d at 524 [emphasis in original].

■ The touchstone of appellate jurisdiction is "an initial exercise of judicial power or authority by a court." *Shell Oil,* 276 Md. at 42, 343 A.2d at 525. That prerequisite, of course, exists in this case; the grant of Katz's motion for a new trial was an exercise of judicial authority by the Circuit Court for Montgomery County. We have seen at least one instance in which the Provincial Court of Appeals issued a writ of mandamus to a lower court; in *Mitchells Adrs. v. Majsty* (1715), *supra, see* text accompanying n. 3, the Court of Appeals issued the writ to the Provincial Court. The early Court's appellate jurisdiction, together with power to issue extraordinary writs in aid of it, passed to our predecessor Court by virtue of § 56 of the Constitution of 1776, providing for "a court of appeals ... whose judgment shall be final and conclusive in all cases of appeal, from the general court, court of chancery, and court of admiralty...." The constitutional amendment proposed by Ch. 55, Acts of 1804 (ratified in 1805) was somewhat more specific:

Sec. 5. There shall be a court of appeals ... which ... shall hold, use, and exercise, all and singular the powers, authorities, and jurisdictions heretofore held, used and exercised by the court of appeals of this state, and also the appellate jurisdiction heretofore used and exercised by the General Court....[9]

The 1805 provision not only transmitted the appellate jurisdiction of the 1776 Court of Appeals; it transferred the appellate jurisdiction of the General Court. That court, like its predecessor, the Provincial Court and like the Court of King's Bench, exercised both original and appellate jurisdiction, including the prerogative writ power, as we have seen. Thus, by 1805, the Court of Appeals had not only the appellate jurisdiction of its own predecessor courts, but also that of the General Court, including the prerogative writ power that could be exercised in aid of that jurisdiction.

It is true that on some occasions we had expressed doubts about the power to issue these writs. *See, e.g., Henson v. State,* 227 Md. 659, 660, 180 A.2d 300, 301 (1962); *Hendrick v. State,* 115 Md. 552, 558–559, 81 A. 18, 20 (1911). And in *State v. Haas,* 188 Md. 63, 76, 51 A.2d 647, 653 (1947), we said, by way of dictum, that we could not issue a writ of prohibition. But these cases involved what we characterized as efforts to seek writs pursuant to original jurisdiction as opposed to in aid of appellate jurisdiction. In *Henson,* for instance, we noted that the application before us was "in substance an original petition to this Court for a writ of mandamus to effect a purpose not related to the exercise of its appellate jurisdiction." 227 Md. at 660, 180 A.2d at 301. And in *State v. Rutherford,* 145 Md. 363, 369, 125 A. 725, 727 (1922), we flatly stated that "[i]t can be readily seen that cases may arise where, for the proper and complete exercise of its appellate jurisdiction, it may be necessary for

---

9. This jurisdictional provision was restated in Article IV, § 2 of the Constitution of 1851 and again in Article IV, § 19 of the Constitution of 1864. The present provision, Article IV, § 14, Constitution of 1867, is taken verbatim from the 1864 language.

this Court to grant the writs of certiorari or mandamus, and the cases above cited do not mean to say, nor do we here decide, that this Court could not issue any appropriate writ in aid of its appellate jurisdiction."

More recently, in *State ex rel. Sonner v. Shearin,* 272 Md. 502, 325 A.2d 573 (1974), we had occasion to discuss prerogative writs. In that case a trial judge suspended a portion of a sentence in direct violation of a legislative command. We concluded that he erred in doing so. *Id.* at 519, 325 A.2d at 582. We held that the law as it then stood permitted the State to appeal from the imposition of an illegal sentence. *Id.* at 526, 325 A.2d at 586. Therefore, we were not required to decide whether we possessed power to issue mandamus or prohibition in those circumstances, although the State had sought those writs by way of alternative relief. We did not reject the possibility of the availability of mandamus. *Id.* at 519–520, 325 A.2d at 583. Speaking through Judge Smith, we were more positive as to *prohibition:*

> A lower court which thus exceeds its power [by imposing an illegal sentence] must be bridled by a court of last resort. Were it otherwise, mandates of the General Assembly could be defied with impunity and the only protection of the public would be the torturous process of judicial removal which would not have the effect of correcting the specific error. Therefore, if there were no right of appeal in this case, we would have no hesitancy in saying that we would act by issuance of the writ of prohibition. *See Kardy v. Shook, J.,* 237 Md. 524, 544, 207 A.2d 83 (1965).[10]

*Id.* at 526, 325 A.2d at 586.

Still more recently, in *Dean v. State,* 302 Md. 493, 500 n. 5, 489 A.2d 22, 25 n. 5 (1985), we made it clear that so far as we were aware, this Court had never issued a writ of

---

**10.** In *Kardy* we issued no writ of prohibition, but we did say "the question as to whether or not the writ of prohibition is available in Maryland is an open one." 237 Md. at 544, 207 A.2d at 94.

prohibition, but we did not say we could not do so. We implied the contrary when we added that "[o]ur past history indicates that the writ would be used only in an extreme case." *Id.* We offered no citation to that "past history," but *Thompson v. M'Kim*, 6 H. & J. 302, 335 (1823), may be an instance of such an extreme case. It involved a stay issued by this Court as the functional equivalent of a writ of prohibition in aid of appellate jurisdiction.

We think it plain enough then that we have long recognized the availability of writs such as mandamus or prohibition, in aid of our appellate jurisdiction, even if we have almost never exercised the power to issue them. The problem lies in deciding what is "in aid of" our appellate jurisdiction. More specifically, does there have to be an appeal to this Court, or at least an appealable judgment, before we can issue a writ?

In *Haas*, 188 Md. at 67, 51 A.2d at 649, we seemed to answer this question in the affirmative. Dismissing a petition for common law certiorari, Chief Judge Marbury wrote for the Court:

> If we have jurisdiction to entertain an appeal in this case, then there is no occasion for the issuance of a writ of *certiorari*. The entire record is before us and we can pass upon all questions ready for our consideration. On the other hand, if an appeal does not lie then we have no power to originate a proceeding here by the writ of *certiorari*.

*See also Moore v. License Com. Pr. Geo.'s Co.*, 203 Md. 502, 505–506, 102 A.2d 272, 274 (1954). Thus, at least where there is an appealable judgment, this Court may issue process to avoid the possibility that judicial review will be frustrated.

In *Thompson v. M'Kim*, 6 H. & J. 302 (1823), Chancellor Bland ordered Thompson to pay a large sum of money into court and the chancellor refused to stay the order pending appeal. It was argued, indeed, that the order was not appealable at all, but our predecessors held otherwise. *Id.*

at 335. The question then became whether this Court had a common law power to issue a stay to the Court of Chancery. The Court ordered one. Chief Judge Buchanan reasoned:

> it is manifestly necessary, to the ends of justice, that there should be a power in special cases to suspend proceedings on the matter appealed from.... [This power, like the same power in the House of Lords,] is necessarily incident to this Court, to preserve the usefulness of its appellate jurisdiction. If it were otherwise, cases might arise in which the appeal would be but as a shadow, pending which the substance might be lost.

*Id.* at 333. In *Thompson,* as we have noted, the issuance of a stay was the functional equivalent of the issuance of a writ of prohibition. It was done to preserve the appeal, for if Thompson had had to pay the sum into court, he might not have been able to press the appeal and in any case, he would have been irreparably injured. 6 H. & J. at 334.

Going a step beyond *Thompson* are some decisions of the Supreme Court of Mississippi. In Mississippi, as in Maryland, the court of last resort has appellate jurisdiction only. There is no express grant of superintending power over inferior tribunals. *See* Miss. Const., Art. 6, § 146 (1890).[11] *And see, e.g., State v. Keeton,* 176 Miss. 590, 595, 169 So. 760, 762 (1936); *White v. State,* 159 Miss. 207, 211, 131 So. 96, 97 (1930); *Yazoo & Miss. Valley R.R. Co. v. Wallace,* 90 Miss. 609, 614–615, 43 So. 469, 470 (1907). In Mississippi there also is a statute—Miss.Code Ann. § 11–1–17 (1972)—under which if a trial judge has not rendered a decision within certain time limits, the party seeking the decision may appeal as if the decision had been rendered adversely to that party. In *Woods v. Lee,* 390 So.2d 1010 (Miss.1980),

---

11. The 1890 constitutional provision was amended in 1983. *See* Miss. Const. Art. 6, § 146 (1983). The new provision, however, does not contain an express grant of superintending power, and it does not appear to alter the high court's exclusively appellate jurisdiction. In any event, the cases we are about to discuss were decided before the 1983 amendment.

the trial judge failed for over a year to rule on a plaintiff's motion for judgment n.o.v. or a new trial. The plaintiff appealed. The supreme court held that no appeal would lie because a judgment adverse to the plaintiff's motion would not, under Mississippi law, have been appealable. But despite the absence of a viable appeal, it held that there was a remedy: mandamus to compel the trial judge to act.

Later came *State v. Maples*, 402 So.2d 350 (Miss.1981). There the judge in a criminal case refused to recuse himself. That decision was not immediately appealable. The State, which had sought the recusal, applied to the Supreme Court of Mississippi for a writ of prohibition, commanding the judge not to sit. The Supreme Court of Mississippi issued the writ. It did so because in this context the function of prohibition, like that of mandamus, is to aid in the appellate process:

> The writ of mandamus is an aid to the appellate process because a superior court directs an inferior court to take some affirmative action so the action of the inferior court may be reviewed on appeal. A writ of prohibition is an aid to the appellate process by preventing action by an inferior court or judge which cannot be remedied on appeal.

402 So.2d at 353. Although the court recognized that refusal to recuse is interlocutory and not immediately appealable, it pointed out that if it denied the writ, the State might never be able to obtain review of the question, because in the event of an acquittal, it could not appeal at all. *Id.* In this way—by making possible the review of a potentially unreviewable question—prohibition aided the appellate process.

In *Glenn v. Herring*, 415 So.2d 695, 698 (Miss.1982), the Mississippi court summarized the development of this line of cases:

> Section 146 of the Constitution confers upon this Court appellate jurisdiction. Appellate jurisdiction, of necessity, includes issuance of such incidental procedural orders or writs necessary to enable this Court to fully exercise its

appellate jurisdiction. At a very early age in the history of the Republic, the United States Supreme Court in *Cohens v. Virginia,* 6 Wheat. 264, 5 L.Ed. 257 (1821), speaking through Chief Justice Marshall, recognized that, "[A] writ of prohibition or any other similar writ is in the nature of appellate process." [6 Wheat. at 397, 5 L.Ed. at 289.] Recognizing that writs of prohibition, writs of mandamus, or other similar writs are aids to the appellate process, we have held that this Court has jurisdiction to issue writs of mandamus and writs of prohibition to inferior courts as an aid to the appellate process.... The writ of mandamus is an aid to the appellate process, because by it, the appellate court directs an inferior tribunal to take some action so its judicial decision may be reviewed on appeal [some citations omitted].

The Tennessee Supreme Court also is a court of exclusively appellate jurisdiction. *See* Tenn. Const. Art. 6, § 2; *State ex rel. Kain v. Hall,* 65 Tenn. 3, 6 (1873). It has taken an approach similar to that employed by the Mississippi Supreme Court. In *State ex rel. Kain v. Hall,* the court dismissed a petition for a writ of mandamus directed to an inferior court concluding that under the circumstances issuance would not have been proper. Nonetheless, the court explained that it had the power to issue the writ in aid of its appellate jurisdiction:

It was held ... that the Constitution of 1834 deprived the Supreme Court of all original jurisdiction; and ... that the legislature could confer no such jurisdiction upon it.... But it will issue an original process in aid of its appellate jurisdiction.... The jurisdiction of this court, then, to award the writ of *mandamus* is merely auxiliary to its appellate power. *The jurisdiction it possesses, not by virtue of any statute, but under the common law, as inherent and necessary* to the exercise of its functions as a court of appellate jurisdiction.

*Id.* at 6 [emphasis supplied]. *Also see* ABA Standards on Judicial Administration, *Standards Relating to Appellate Courts* § 3.00 at 5 (Approved Draft 1977), explaining that

> [a]lthough used infrequently, the power to issue extraordinary writs to protect an appellate court's jurisdiction, and to secure conformity to its mandates, is essential for maintaining the integrity of the legal system. Under generally recognized principles of law, that power is inherent and should be universally so regarded.

The notion that mandamus or prohibition may be used as an aid to appellate jurisdiction, even though there is no appeal pending in an appellate court, and even though no immediate appeal is possible, finds support in federal cases as well. Indeed, it was federal authority upon which the Mississippi court substantially relied in the trilogy of cases we have just reviewed.

Early on, in *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), the Supreme Court of the United States, through Chief Justice Marshall, declared unconstitutional Section 13 of the Judiciary Act of 1789 (1 Stat. 53, 58–59) which purported to give the Court power to issue mandamus to public officers. Chief Justice Marshall wrote:

> To enable this court, then, to issue a mandamus it must be shown to be an exercise of appellate jurisdiction, or to be necessary to enable them to exercise appellate jurisdiction.

*Id.* at 175, 2 L.Ed. at 73. And he defined appellate jurisdiction:

> It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper, is in effect the same as to sustain an original action for that paper, and, therefore, seems not to belong to appellate but to original jurisdiction.

*Id.* at 175–176, 2 L.Ed. at 73.[12] As a consequence, Congress could not constitutionally authorize the Court to issue mandamus to the Secretary of State. *See also, e.g., Chandler v. Judicial Council,* 398 U.S. 74, 86, 90 S.Ct. 1648, 1654, 26 L.Ed.2d 100, 108–109, *reh'g denied,* 399 U.S. 937, 90 S.Ct. 2248, 26 L.Ed.2d 809 (1970) (authority of Supreme Court to issue prohibition or mandamus can be constitutionally exercised only insofar as those writs are in aid of its appellate jurisdiction). In *Cohens v. Virginia,* 6 Wheat. 264, 397, 5 L.Ed. 257, 289 (1821), Chief Justice Marshall once more identified a "writ of prohibition or any other similar writ [as] in the nature of appellate process." And in *Ex parte Crane,* 5 Pet. 190, 8 L.Ed. 187 (1831), the Chief Justice, again writing for the Court, held that § 13 of the Judiciary Act of 1789 gave the Court power to issue mandamus to a trial court to require it to restore the text of jury instructions to bills of exceptions, thereby making the jury charge subject to appellate review. He explained:

> A mandamus to an officer is held to be the exercise of original jurisdiction; but a mandamus to an inferior court of the United States is in the nature of appellate jurisdiction.

30 U.S. 5 Pet. at 193, 8 L.Ed. at 94.[13]

Thus it appears that mandamus or prohibition may issue in aid of appellate jurisdiction even though no appellate

---

**12.** This distinction between original and appellate jurisdiction is essentially the same as the one we drew in *Shell Oil Co. v. Supervisor,* 276 Md. 36, 42–43, 343 A.2d 521, 525 (1975); for appellate jurisdiction to exist, there must be, at a minimum, some action of an inferior *judicial* tribunal.

**13.** From our perspective, it is unimportant that *Crane* and other federal decisions rely on § 13 or § 14 of the Judiciary Act of 1789. Section 14 is now codified at 28 U.S.C. § 1651(a) (the "All Writs Act") ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"). We have no "All Writs Act" in Maryland. But, at least so far as the Court of Appeals is concerned, our cases recognize that we have a power equivalent to that granted to the Supreme Court by 28 U.S.C. § 1651(a); that is, the power to issue appropriate writs in exercise of

proceeding is pending in the appellate court, at least where there is some potentiality of eventual appellate review by appeal or by certiorari. *See Ex Parte Republic of Peru,* 318 U.S. 578, 584–585, 63 S.Ct. 793, 797–798, 87 L.Ed. 1014, 1018–1019 (1943); Wolfson, "Extraordinary Writs in the Supreme Court Since Ex Parte Peru," 51 Colum.L.Rev. 977, 978–981 (1951). The federal position is made clear in *McClellan v. Carland,* 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910).

In that case, McClellan and others petitioned the United States Circuit Court of Appeals for the Eighth Circuit for mandamus to require a United States district court judge to set aside certain stay orders and to proceed to try and determine a case then pending before him. The Circuit Court of Appeals refused to do so. The Supreme Court reversed. Pointing out that if the pending case were decided the circuit court would have appellate jurisdiction, the Supreme Court reasoned:

There are not wanting decisions in the Federal courts holding different views as to the right to issue such writs as are involved in this case, before the appellate court has actually obtained jurisdiction of the case. There are expressions in opinions of this court to the effect that such writs issue in aid of a jurisdiction actually acquired. But we think it the true rule that where a case is within the appellate jurisdiction of a higher court a writ of mandamus may issue in aid of the appellate jurisdiction which might otherwise be defeated by the unauthorized action of the court below.

\* \* \* \* \* \*

Inasmuch as the order of the ... [trial] court staying the proceeding until after final judgment in the state

---

our appellate jurisdiction. *See, e.g., State ex rel. Sonner v. Shearin,* 272 Md. 502, 519, 325 A.2d 573, 583 (1974); *Moore v. License Com. Pr. Geo., Co.,* 203 Md. 502, 505, 102 A.2d 272, 274 (1954); *State v. Haas,* 188 Md. 63, 67, 51 A.2d 647, 649 (1947); *State v. Rutherford,* 145 Md. 363, 369, 125 A. 725, 727 (1922); *Hendrick v. State,* 115 Md. 552, 559, 81 A. 18, 20 (1911); *Thompson v. M'Kim,* 6 H. & J. 302, 332–333 (1823).

court, might prevent the adjudication of the questions involved, and thereby prevent a review thereof in the circuit court of appeals, which had jurisdiction for that purpose, we think the court had power to issue the writ of mandamus to require the ... [trial] court to proceed with and determine the action before it.

217 U.S. at 280, 30 S.Ct. at 504, 54 L.Ed. at 766. In short, a writ may issue in aid of appellate jurisdiction even though no case is pending in the appellate court. *La Buy v. Howes Leather Co., Inc.,* 352 U.S. 249, 255, 77 S.Ct. 309, 313, 1 L.Ed.2d 290, 296 (1957). *And see Chandler v. Judicial Council,* 398 U.S. at 112, 90 S.Ct. at 1668, 26 L.Ed.2d at 123–124 (Harlan, J., concurring); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* §§ 3932 & 4005 (1977).

We are persuaded that this view of the appellate use of writs such as mandamus and prohibition is sound. If the use of a writ is "necessary to enable ... [the Court] to exercise appellate jurisdiction" it is in aid of that jurisdiction. *Marbury v. Madison,* 1 Cranch at 175, 2 L.Ed. at 73. The power is necessary "to preserve the usefulness of ... appellate jurisdiction" if the failure to exercise it would cause the right to appellate review to "be but a shadow, pending which the substance might be lost." *Thompson v. M'Kim, supra,* 6 H. & J. at 333. In the case before us, the trial court acted in a criminal case that had been tried on the merits, and in which a guilty verdict had been entered. We have appellate jurisdiction, or at least potential jurisdiction, over that category of case. The potential exercise of that jurisdiction has been frustrated by the trial court's refusal to enter a final judgment; instead it ordered a new trial. Should the new trial result in an acquittal, from which the State could not appeal, any appellate review of the court's action in ordering the new trial would be totally precluded. *State v. Maples, supra,* 402 So.2d at 353. Under these circumstances, we have the power to issue mandamus or prohibition. To the extent that *Henson v. State,* 227 Md. at 660, 180 A.2d at 301; *Moore*

*v. License Com. Pr. Geo.'s Co.*, 203 Md. at 505–506, 102 A.2d at 274; *State v. Haas*, 188 Md. at 67, 51 A.2d at 649; and *State v. Rutherford*, 145 Md. at 368–369, 125 A. at 727, all *supra* indicate that a writ cannot issue unless there is an immediately appealable judgment below, or a case actually pending in this Court, they are overruled.[14]

As to which writ should issue in a case of this sort, we are not disposed to engage in common law quibbles about the differences between mandamus and prohibition. If, as we hold, we have jurisdiction to issue to an inferior court peremptory writs in aid of our appellate jurisdiction, we have the power to take appropriate remedial action. How we label the document we issue is not important. As Justice Holmes once remarked, "[i]t does not matter very much in what form an extraordinary remedy is afforded...." *Ex Parte Simons*, 247 U.S. 231, 239–240, 38 S.Ct. 497, 498, 62 L.Ed. 1094, 1096 (1918). *And see* 16 Wright, *supra*, § 3932 at 206–208. What is important is whether any prerogative writ should issue in this case. To that subject we now turn.

### III. *Should a Writ Issue in this Case?*

### A. *General Principles*

█ The common law extraordinary writs of mandamus and prohibition are just that—extraordinary; even when the power to issue them exists, whether to take that action is discretionary. The principles governing the exercise of that discretion are much the same, whether the court that is asked to issue the writ is invoking superintending power or acting in aid of its appellate jurisdiction. "The power [to issue a prerogative writ] is one which ought to be exercised with great caution...." *Ex Parte Burr*, 9 Wheat. 529, 531, 6 L.Ed. 152, 152 (1824). Ordinarily, a writ will not

---

**14.** Review of these cases indicates that in none of them was consideration given to the federal authorities that developed the principle on which we now rely. In *Haas* and *Moore* the language in question is merely *dicta.* Moreover, in *Rutherford,* the language appears so general in scope as not to preclude the holding we have reached.

lie to control the exercise of discretion. *Ex Parte Bradley*, 74 U.S. (7 Wall.) 364, 376–377, 19 L.Ed. 214, 219 (1869). Such a writ ordinarily will not issue when another remedy is available, Ferris, *supra*, § 212 (mandamus) and is not a substitute for appeal or writ of error; *id.*, §§ 191 (mandamus) and 324 (prohibition). *See also* 16 Wright, *supra*, § 3932 at 205–206. Generally speaking, more than mere error must be shown.

Some commentators have said that under what they view as the traditional approach, writs appropriately issue "only to control actions beyond the jurisdiction of an inferior court, or to compel action that the court lacked power to withhold." 16 Wright, *supra*, § 3933 at 213. But, according to Wright, in recent times the use of the extraordinary writ has "broadened to include use of the writs to correct clear abuse of discretion, and more recently ... to satisfy other peculiar needs for interlocutory review." *Id.*

Lewis Hochheimer espoused the "traditional approach," at least as to writs of prohibition. Hochheimer wrote that "[t]he writ of prohibition issues from superior courts to arrest the proceedings of inferior courts ... when such proceedings are without or in excess of their jurisdiction" [footnote omitted]. L. Hochheimer, *The Law of Crimes and Criminal Procedure*, § 446 (1897).

Earlier commentators, however, recognized that a prerogative writ could issue to control actions of a lower court that were not jurisdictional in nature. As to mandamus, Blackstone asserts that it is designed to "inforce the due exercise of those judicial ... powers, with which [inferior courts are invested] ... not only by restraining their excesses, but also by quickening their negligence, and obviating their denial of justice." 3 Blackstone, *supra*, at 110–111. And as to prohibition, the appellate court may apply it to command a judge and the parties of an inferior court "to cease from prosecution thereof" because the case "does not belong to that jurisdiction, but to the cognizance of some other court...." The same remedy is available "if, in handling of matters clearly within their cognizance, they

transgress the bounds proscribed to them by the laws of England...." *Id.* at 112.

In the case of *Appo v. People,* 20 N.Y. 531 (1860), the State petitioned the New York Court of Appeals for a writ of prohibition directing a trial judge to vacate his order granting a new trial in a criminal case. The defendant argued that because the court did not act outside its jurisdiction in granting a new trial, the Court of Appeals had no power to issue the writ. The Court held otherwise finding that "the writ lies to prevent the exercise of any unauthorized power, in a cause or proceeding of which the subordinate tribunal has jurisdiction, no less than when the entire cause is without its jurisdiction." *Id.* at 542.

In Maryland common law mandamus has been described as a prerogative writ "grantable where the public justice of the State is concerned." *Runkel v. Winemiller,* 4 H. & McH. at 449. It is a writ "to prevent disorder, from a failure of justice, where the law has established no specific remedy, and where in justice and good government there ought to be one...." *Id.* at 449.

█ From these authorities we glean that we may issue a prerogative writ if we believe the interests of justice require us to do so in order to restrain a lower court from acting in excess of its jurisdiction, otherwise grossly exceeding its authority, or failing to act when it ought to act. The question then becomes whether the trial judge's grant of a new trial to Katz falls within one or more of these categories.

B. *The Power to Grant a New Trial in a Criminal Case*

The circumstances surrounding Judge Miller's granting of a new trial are recounted at pp. 283–285 *supra,* and we need not repeat them fully here. We recapitulate briefly.

By denying Katz's motions for judgment of acquittal, Judge Miller determined that there was sufficient evidence upon which a jury could base a finding of guilt. Neverthe-

less, when the jury did exactly that, the trial judge ordered a new trial. It is clear from his choice of words in doing so that he engaged in an independent weighing of the evidence. Specifically, he summed up the case as a question of weighing a single witness's credibility against the defendant's. Although he did not state that he disagreed with the jury verdict, he indicated that he ordered the new trial because of the "possibility" of injustice. He later stated that he himself was not convinced of the defendant's guilt. Judge Miller acted under the assumption, therefore, that he had discretion to set aside a jury verdict and order a new trial where he considered the verdict to be against the weight of the evidence, and where he weighed the evidence in light of the credibility (or lack of it) of the State's principal witness.

That a new trial may be granted in a criminal case tried to a jury is undoubted. The existence of the power is recognized in Md.Code (1987 Repl.Vol.) Art. 27, § 594, and in Md.Rule 4–331 and its predecessor rules. It was a power that existed at common law, at least as to misdemeanor cases, although not as to felonies.[15] As long ago as 1859 it seemed well-settled that Maryland courts could grant new trials after convictions. *See Ford v. State,* 12 Md. 514 (1859). The question we face is not whether a new trial may be granted, but when; that is, upon what grounds. More specifically, can a jury's guilty verdict be set aside and a new trial ordered because the trial judge has serious reservations about the credibility of the chief prosecution witness?

At common law there could be a new trial if the court thought the verdict was against the weight of the evidence. 1 Stephen, *History of the Common Law of England,* 310,

---

**15.** According to Holdsworth, in 1673 it was decided that a new trial could be granted in a misdemeanor case. The rule was not then applied to felony cases, and in any case a new trial could be granted only after a conviction, not after an acquittal. 1 Holdsworth, *supra,* at 216–217. *See also* 5 L. Orfield, *Criminal Procedure Under the Federal Rules* § 33.5 (1967).

311 (1883). *And see* 5 L. Orfield, *Criminal Procedure Under the Federal Rules* § 33.5 (1967). Professor Hochheimer also asserts that a new trial could be ordered if the verdict was against the evidence. L. Hochheimer, *The Law of Crimes and Criminal Procedure* § 184 (2d ed. 1904). In the case before us, Katz points to *dicta* in a civil case, *Snyder v. Cearfoss*, 186 Md. 360, 368–369, 46 A.2d 607, 610–611 (1945). There our predecessors, stating that a new trial could be granted because a verdict was against the evidence or against the weight of the evidence, said that a court should examine the evidence and the verdict and if they could not be reconciled, then it should order a new trial, if it had a reasonable doubt that justice had been done. It is not clear from the *Snyder* opinion whether the trial judges (who had granted a new trial) did so on the basis of a credibility determination or merely because of what they perceived as very weak evidence produced by the plaintiffs, who recovered in the trial court. But Katz believes that *Snyder* supports the action taken by the trial judge here.

The State, on the other hand, refers us to *State v. Devers*, 260 Md. 360, 272 A.2d 794, *cert. denied*, 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971). In *Devers* we reviewed a decision of the Court of Special Appeals which had held that on a motion for new trial the trial court must weigh the evidence and judge the credibility, when the verdict is challenged as being against the evidence. "[O]nly in so doing is it able to ascertain whether there is such a preponderance of proof in favor of the accused 'as to show that manifest injustice has been done by the verdict.' " *Devers v. State*, 9 Md.App. 366, 372, 264 A.2d 291, 294 (1970) (citing *Johnson v. State*, 219 Md. 481, 483, 150 A.2d 446, 447 (1959)). We reversed.

In the course of doing so, we considered whether motions for judgment of acquittal should have been granted. Referring to what was then Art. XV, § 5 of the Constitution (now Art. 23 of the Declaration of Rights), we noted that its requirements that in criminal cases "the Jury shall be the Judges of Law, as well as of fact" had at first precluded

judicial consideration of such things as motions for judgment of acquittal, motions for directed verdict, or the like because the constitutional provision did not permit a judge to pass upon the sufficiency of the evidence. But by constitutional amendment effective 1 December 1950, a court was expressly authorized to "pass upon the sufficiency of the evidence to sustain a conviction." 260 Md. at 369, 272 A.2d at 799. We observed that what a court does in this regard is strictly circumscribed. "It does not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt, ... but merely ascertains whether there is any relevant evidence, properly before the jury, legally sufficient to sustain a conviction...." *Id.* at 371, 272 A.2d at 800 [citations omitted]. Applying this test, we upheld the trial court's denial of motions for judgment of acquittal. "There was evidence, if believed, sufficient to sustain the convictions." *Id.* at 372, 272 A.2d at 800.

The Court then turned to the motion for new trial, and as to that we reasoned that "if evidence is to be weighed on a motion for a new trial after a jury has returned a guilty verdict in a criminal case, the power to do so must be derived from the 1950 amendment to ... Art. XV, § 5," but we had "no difficulty in holding that it is not...." 260 Md. at 379, 272 A.2d at 804. Instead, we concluded

> that the test of sufficiency to be applied in considering a motion for a new trial is exactly that applied in considering a motion for judgment of acquittal: was there any relevant evidence, properly before the jury, legally sufficient to sustain a conviction? Any wider scope of review of the evidence would be impermissible under our Constitution.

*Id.* We went on to reject any analogy to the grant of a new trial in a civil case. *Id.* at 380, 272 A.2d at 804. And though we carefully pointed out that "the trial court is [not] precluded from granting a new trial in a criminal case where the jury's verdict is clearly contrary to the evidence, because this stems from venerable custom and usage ...,"

we emphasized that "[t]he granting of a new trial in such a case involves no more than a determination by the trial court that the evidence was insufficient to sustain the conviction." *Id.* at 379–380, 272 A.2d at 804. In short, *Devers* instructs that in a criminal case, a motion for new trial based on alleged deficiencies in the evidence introduced is to be treated precisely like a motion for judgment of acquittal and granted only if the latter motion should be or should have been.

There is certainly precedent for the notion that a motion for new trial based on evidentiary lack must be treated as attacking the sufficiency of the evidence, and thus does not permit a court to weigh evidence. *See, e.g., Debinski v. State,* 194 Md. 355, 362, 71 A.2d 460, 464 (1950); *Herring v. State,* 189 Md. 172, 175, 55 A.2d 332, 334 (1947); *Quesenbury v. State,* 183 Md. 570, 572–573, 39 A.2d 685, 686 (1944); *Myers v. State,* 137 Md. 496, 502, 113 A. 92, 95 (1921); *Myers v. State,* 137 Md. 491, 495, 113 A. 90, 92 (1921); *Myers v. State,* 137 Md. 482, 485–488, 113 A. 87, 88–89 (1921) (proper method for raising sufficiency of the evidence is by motion for new trial). Those cases, of course, were decided before the constitutional amendment that expressly permitted the court to pass on sufficiency and thus to grant what is now a motion for judgment of acquittal. *See Wright v. State,* 198 Md. 163, 170, 81 A.2d 602, 606 (1951). They seem to stand for the proposition that although the court could not acquit on the ground of insufficiency, this being a jury question, *Quesenbury,* 183 Md. at 573, 39 A.2d at 686, it could grant a new trial on that ground. But there are also indications that a wider discretion to examine evidence is available.

For example, *Auchincloss v. State,* 200 Md. 310, 89 A.2d 605 (1952), like *Devers,* was a case involving both a motion for a directed verdict (now a motion for judgment of acquittal) and a motion for new trial. It arose after 1 December 1950, so it was permissible for a court to enter judgment of not guilty as a matter of law, if the evidence was insufficient. Judge Henderson, writing for the Court, declined to

pass on the sufficiency issue because it had not been properly preserved. *Id.* at 315, 89 A.2d at 607. He added, however, language commonly employed in sufficiency cases: "in no event could this [C]ourt undertake to pass upon the weight of the evidence or decide whether guilt has been shown beyond a reasonable doubt." *Id.* at 316, 89 A.2d at 607. As to the motion for new trial, which had been denied, Judge Henderson explained the then-current view that because a ruling on a motion for new trial was an exercise of the trial judge's discretion, "the granting or refusal of such a motion is not reviewable." *Id.* But, once again, he had something to add: "Of course, upon the hearing of such a motion the trial court may consider the weight as well as the sufficiency of the evidence." *Id.*

A few years later, in *Thomas v. State*, 215 Md. 558, 561, 138 A.2d 878, 880 (1958), we again declined to review the denial of a motion for a new trial. Significantly, the main basis for the motion was the lack of credibility of the principal prosecuting witness. We did not say that credibility could not be considered or that evidence could not be weighed. We said (by way of assurance that if we had reviewed the exercise of the trial court's discretion we would have agreed with it): "Judge Henry gave full consideration to the relevant facts and, in his sound discretion, decided they did not justify a new trial." *Id.*

These cases suggest that *Devers* may have been unduly restrictive in insisting that evidentiary deficiency asserted in a motion for new trial must be equated with evidentiary insufficiency asserted in a motion for judgment of acquittal. Various questions arise as well. If that equation is correct, why even allow evidentiary lack to be raised in a motion for new trial in a criminal case? Rule 4–324 provides for court review of sufficiency of the evidence on motion for judgment of acquittal. If sufficiency has been reviewed pursuant to a Rule 4–324 motion, need the very same question be reviewed again on a motion for a new trial pursuant to Rule

4-331? [16] The second stage of review hardly seems necessary, unless the ability to raise the issue by way of motion for new trial is intended to permit a defendant to argue sufficiency (and to raise it on appeal) even though that defendant has not preserved the issue by taking the action required under Rule 4-324. *See State v. Lyles,* 308 Md. 129, 135-136, 517 A.2d 761, 764-765 (1986), and *Auchincloss, supra.* That hardly seems likely.

■ Moreover, insufficiency of the evidence is today a singularly inappropriate basis for ordering a new trial, because if the evidence was insufficient to go to the jury in the first place, double jeopardy principles preclude a new trial. The granting of a motion for judgment of acquittal, of course, has this effect. *Brooks v. State,* 299 Md. 146, 151, 472 A.2d 981, 984 (1984).[17] And the granting of a motion for new trial on the basis of insufficiency is tantamount to the granting of a motion for judgment of acquittal, *Burks v. United States,* 437 U.S. 1, 10-11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1, 9 (1978). "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecutor another opportunity to supply evidence which it failed to muster in the first proceeding." *Id.* [footnote omitted]. *See also Greene v. Massey,* 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15, 21 (1978) (decided the same day as *Burks* ). In *Hudson v. Louisiana,* 450 U.S.

---

**16.** As to problems, in a civil context, of a motion for new trial based on insufficient evidence to go to the jury, when the court has already refused to take the case from the jury on that ground, *see* 2 J. Poe, *Pleading and Practice in Courts of Common Law* § 336A (H. Tiffany, 5th ed. 1925).

**17.** In *Mackall v. State,* 283 Md. 100, 387 A.2d 762 (1978), we applied *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), and reversed a conviction because it was not supported by sufficient evidence. We pointed out that *Gray v. State,* 254 Md. 385, 255 A.2d 5 (1969), *cert. denied,* 397 U.S. 944, 90 S.Ct. 961, 25 L.Ed.2d 126 (1970), which had permitted, under some circumstances, a new trial despite an insufficiency determination, "is no longer the law of this State." 283 Md. at 114, 387 A.2d at 769-770.

40, 44 n. 5, 101 S.Ct. 970, 973 n. 5, 67 L.Ed.2d 30, 34 n. 5 (1981), however, the Supreme Court explained that *Burks* did not preclude a new trial granted for some evidentiary lack less than insufficiency to take the case to the jury— *e.g.*, a verdict against the weight of the evidence. That explanation became a holding in *Tibbs v. Florida*, 457 U.S. 31, 42–43, 102 S.Ct. 2211, 2218–2219, 72 L.Ed.2d 652, 661–662 (1982).

■ Then, too, as we shall later see, a number of American jurisdictions do allow some degree of weighing of the evidence, including consideration of credibility, on motions for new trial. Permitting that to be done, given the different functions of motions for judgments of acquittal and motions for new trials, is a not unreasonable approach. Thus there are several bases for questioning the strict rule of *Devers*. If, however, the *Devers* court was correct in saying that our Constitution requires the result it reached, 260 Md. at 379, 272 A.2d at 804, further discussion of the subject would be idle; no one here asserts that the *Devers* rule is itself unconstitutional in light of any provision of the United States Constitution.[18] So we examine whether the Maryland Constitution indeed mandates that in a criminal case a motion for new trial alleging some evidentiary lack may be granted only if the evidence is or was insufficient to convict; that is, insufficient to take the case to the jury in the first place.

The constitutional provision in question, as we have indicated, is what is now the first paragraph of Article 23 of the Declaration of Rights:

In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court

---

**18.** A claim such as this would undoubtedly fail in light of *Hudson v. Louisiana*, 450 U.S. 40, 44 n. 5, 101 S.Ct. 970, 973 n. 5, 67 L.Ed.2d 30, 34 n. 5 (1981), where the Court determined that the permissibility of weighing evidence on a motion for a new trial is a question of state law.

may pass upon the sufficiency of the evidence to sustain a conviction.[19]

*Sans* the "except" clause (added by Ch. 407, Acts of 1949, effective 1 December 1950), this language, in substantially its present form, was adopted as Art. X, § 5 of the Constitution of 1851. It became Art. XII, § 4 of the 1864 Constitution and Art. XV, § 5 of the 1867 Constitution. It was transferred to the Declaration of Rights in 1978. *Ennis v. State*, 306 Md. 579, 592, 510 A.2d 573, 580 (1986).

We are told that the language of the original provision was "merely declaratory, and has not altered the pre-existing law regulating the powers of the court and jury in criminal cases." *Franklin v. State*, 12 Md. 236, 249–250 (1858). *See State v. Buchanan*, 5 H. & J. 317, 330 (1821) (jury in criminal case has right to judge both the law and the facts, but usually respects the advice of the judge on questions of law). *And see* 2 *Debates of the Constitutional Convention of 1851* at 767 (Mr. Spencer "understood the practice to have been for the jury to decide the law"); *Report of the Trial of the Hon. Samuel Chase*, app. at 12 (Evans ed. 1805) (Chase, once a judge of the Maryland General Court, always respected the jury's right to judge the law as well as the facts).

The concept of jury as judge of the law was not, moreover, unique to nineteenth century Maryland. Although in England it had been settled, prior to the Revolution, that law was for the judge and facts for the jury, that notion was not always accepted in the colonies. In many New England colonies, for example, judges exercised but limited power, doing little more than to preserve order. *See* Howe, *"Juries as Judges of Criminal Law,"* 52 Harv.L.Rev. 582, 590–591 (1939). One reason for this may have been colonial

---

**19.** The second paragraph of Art. 23 requires the inviolable preservation of the right to jury trials in civil cases in which the amount in controversy exceeds $500.

antipathy to royal officials. Another may have arisen from the fact that many judges were lay people and perhaps no more learned in the law than jurors. Additionally, there was a view that "in small agricultural communities a highly democratic tribunal can adequately cope with matters which in other circumstances can more effectively be dealt with through a discreet separation of judicial powers." *Id.* at 591.

In any case, the colonists were often accustomed to jury exercise of extensive powers. *Id.* This produced in America "the demand that the jury in criminal cases should not only determine the facts but judge the law as well." *Id.* at 582. And during the nineteenth century, it was reiterated "with an extraordinarily insistent vitality ... that the people themselves were competent to interpret their laws." *Id.* As a result, there was widespread adoption of the practice enunciated in the 1851 Maryland Constitution. But quickly a process of attenuation began; [20] by the time Professor Howe wrote (in 1939), he thought that only Maryland and Indiana retained a constitutional provision for juries as

---

20. The details of this trend, whether on a national basis or in Maryland, are not important to today's decision. Those who wish more information on the national picture as well as the Maryland background may consult *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *Wyley v. Warden, Maryland Penitentiary,* 372 F.2d 742 (4th Cir.1967); *Brooks v. State,* 299 Md. 146, 148–149, 472 A.2d 981, 982–983 (1984); *Giles v. State,* 229 Md. 370, 382–383, 183 A.2d 359, 364–365 (1962), *appeal dismissed,* 372 U.S. 767, 83 S.Ct. 1102, 10 L.Ed.2d 137 (1963); *Slansky v. State,* 192 Md. 94, 100–107, 63 A.2d 599, 601–605 (1949); Dennis, "Maryland's Antique Constitutional Thorn," 92 U.Pa.L.Rev. 34 (1943); Henderson, "The Jury as Judges of the Law and Fact in Maryland," 52 M.S.B.A. 184 (1947); Howe, "Juries as Judges of Criminal Law," 52 Harv.L.Rev. 582 (1939); Jacobsohn, "The Right to Disagree: Judges, Juries, and the Administration of Criminal Justice in Maryland," 1976 Wash.U.L.Q. 571; Markell, "Trial by Jury—A Two–Horse Team or One–Horse Team?", 42 M.S.B.A. 72 (1937); Prescott, "Juries as Judges of the Law: Should the Practice be Continued?" 60 M.S.B.A. 246 (1955); Note, "The Jury's Role Under the Indiana Constitution," 52 .Ind.L.J. 793 (1977); Note, "The Changing Role of the Jury in the Nineteenth Century," 74 Yale L.J. 170 (1964).

judges of law as well as fact. 52 Harv.L.Rev. at 613–614.[21]

So far as Maryland is concerned, the process of attenuation began in 1858 with *Franklin*, where Chief Judge Le Grand announced that the jury's right to judge the law did not permit it to decide whether the law was constitutional—only a judge could do that. 12 Md. at 246. The subsequent determinations that the jury's right to judge the law did not extend to various matters in a criminal trial need not be traced here. They culminated in *Stevenson v. State*, 289 Md. 167, 423 A.2d 558 (1980), *later proceeding*, 299 Md. 297, 473 A.2d 450 (1984), and *Montgomery v. State*, 292 Md. 84, 437 A.2d 654 (1981).[22] The law now is that the jury's right to judge the law

> is limited to those instances when the jury is the final arbiter of the law of the crime. Such instances arise when an instruction culminates in a dispute as to the proper interpretation of the law of the crime for which there is a *sound basis*. Under such circumstances, counsel are granted leave to argue contrary to the court's instructions on the law of the crime and this is the occasion when Article 23 and Rule 757 b [now Rule 4–325(c) ] require the court's instructions to be advisory. Even here, counsel may not in their arguments attempt to persuade the jury to enact new law or to repeal or ignore existing law. However, in those circumstances where there is no dispute nor a sound basis for a dispute as to the law of the crime, the court's instructions are binding on the jury and counsel as well [emphasis in original].

292 Md. at 89, 437 A.2d at 657. *See also Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983), *cert. denied*, 466 U.S. 993,

---

**21.** Howe failed to note that at the time of his article Georgia also had a similar constitutional provision. *See* Ga. Const. Art. 1, § 1, ¶ 11(a) (1877, amended 1976).

**22.** For more extensive discussion of the evolution, *see*, in addition to *Stevenson v. State*, 289 Md. 167, 423 A.2d 558 (1980), cases such as *Wyley, Brooks, Giles,* and *Slansky*, all *supra. Also see* n. 20, *supra.*

104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (Art. 23 does not apply to a capital sentencing proceeding).

As the Supreme Court has aptly observed, because of judicial narrowing, what is now Article 23 of the Declaration of Rights "does not mean precisely what it seems to say." *Brady v. Maryland,* 373 U.S. 83, 89, 83 S.Ct. 1194, 1197–1198, 10 L.Ed.2d 215, 219 (1963) [footnote omitted]. What it all boils down to now is that the jury's right to judge the law is virtually eliminated; the provision, as we have construed it, basically protects the jury's right to judge the facts.[23] The question becomes whether this right prevents a judge from weighing evidence on a motion for new trial.

There are cases which, speaking in general terms, say that "the individual and total weight assigned to the evidence is within the exclusive province of the jury." *E.g., Gore v. State,* 309 Md. 203, 214, 522 A.2d 1338, 1343 (1987). That particular remark, however, was made in the context of holding that a judge had improperly commented on a matter that was within the jury's fact-finding province; the judge told the jury that as a matter of law there was sufficient evidence to convict Gore. *Id.* at 209–214, 522 A.2d at 1341–1343. Other statements to like effect have often occurred during discussions of a court's inability to pass (before 1950) on the sufficiency of the evidence in a criminal case. It was in that context in *Devers* that we made a comment about a court's inability to weigh evidence. 260 Md. at 371, 272 A.2d at 800. When we said in *Shelton v. State,* 198 Md. 405, 412, 84 A.2d 76, 80 (1951), that "this Court will not inquire into or measure the weight of evidence, and will not reverse the judgment if there is any proper evidence before the jury on which to sustain a conviction," we were writing in the context of sufficiency of

---

**23.** Of course the development of substantial limitations on the jury's constitutional right to decide the law for itself does not, as a practical matter, disturb its power to do so through a general verdict which, if it is not guilty, is virtually unreviewable. *Slansky v. State, supra,* 192 Md. at 108, 63 A.2d at 605; Markell, *supra,* 42 M.S.B.A. at 73–74.

the evidence on a motion for a directed verdict of not guilty (now a motion for judgment of acquittal). The same is true of such cases as *Chisley v. State,* 202 Md. 87, 92, 95 A.2d 577, 579 (1953); *Abbott v. State,* 188 Md. 310, 313, 52 A.2d 489, 490 (1947); *Brack v. State,* 187 Md. 542, 546, 51 A.2d 171, 172 (1947); *Simmons v. State,* 165 Md. 155, 176, 167 A. 60, 68–69 (1933); and *Bloomer v. State,* 48 Md. 521, 538–540 (1878), *overruled on other grounds, Gardner v. State,* 286 Md. 520, 408 A.2d 1317 (1979).

In other words, until 1950, a court could not pass on the sufficiency of the evidence as a matter of law. Sufficiency, of necessity, was left to the jury—it was one of the areas of law, or mixed law and fact, that was indeed within the sole province of that body. Hence the utterance of many a statement about the court's inability to weigh evidence, and about the exclusivity of a jury's right to determine facts. But the 1950 constitutional amendment put an end to the exclusivity of the jury's right to judge sufficiency. Accordingly, nothing in Art. 23's clause about juries as judges of law prevents a court from weighing the evidence on a motion for new trial. That is really not a question of law, but one of fact. The inquiry now becomes whether the second clause of Art. 23's first paragraph—that making the jury the judge of fact—inhibits a court from weighing evidence.

The concept that fact-finding is the primary and basic function of the jury is not limited to Maryland, nor is it applicable only to civil cases. *See* Cooper, "Directions for Directed Verdicts: A Compass for Federal Courts," 55 Minn.L.Rev. 903, 909–910 (1971); 9 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2521 (1971); Note, "The Changing Role of the Jury in the Nineteenth Century," 74 Harv.L.Rev. 170 (1964). We already know that at common law, where judges decided the law (as they do for most purposes now in Maryland), motions for new trial could be made in criminal cases, on the ground that a guilty verdict was against the evidence, 4 Blackstone, *supra,* at 355; J. Chitty, *Chitty's Criminal Law,* 535 (1819); 1 Ste-

phen, *supra,* at 310–311, or against the weight of the evidence, 1 Holdsworth, *supra* at 216–217; 5 L. Orfield, *supra,* § 33.5 at 291. It is instructive to turn to other American jurisdictions, where judges decide law and juries fact, to see how they approach this problem.

Let us begin with the federal courts. Federal Rule of Criminal Procedure 33, like our Rule 4–331(a), authorizes a court to order a new trial "in the interest of justice." And as in our rule, no more specific ground for granting the motion is given, save the provisions dealing with newly-discovered evidence. Federal decisions dealing with Rule 33 may be, therefore, enlightening.

Under Rule 33, the power of a court on a motion for new trial is much broader than its authority on a motion for judgment of acquittal. 3 C. Wright, *Federal Practice and Procedure* § 553 (2d ed. 1982). The court "may weigh the evidence and consider the credibility of witnesses" and if

> the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted. It has been said that on such a motion the court sits as a thirteenth juror.

*Id.* [footnotes omitted].

The concept of the thirteenth juror is, indeed, well-developed in federal jurisprudence. In *Tibbs v. Florida, supra,* the Supreme Court distinguished between a determination of insufficiency of the evidence on a motion for judgment of acquittal and a determination that a guilty verdict was against the weight of the evidence on a motion for new trial.[24] If a conviction is overturned for insufficiency, it means the case never should have gone to the jury because no rational fact-finder could have found the defendant guilty beyond a reasonable doubt. This does not implicate credibility issues. 457 U.S. at 37–38, 102 S.Ct. at 2215–

---

**24.** For a thorough explanation of the sufficiency—weight distinction, *see* Seward, "The Sufficiency—Weight Distinction—A Matter of Life or Death," 38 U.Miami L.Rev. 147, 153–159 (1983).

2216, 72 L.Ed.2d at 658–659. But to set aside a verdict as against the weight of the evidence does involve a determination that a greater amount of credible evidence supports one side of an issue or cause than the other. *Id.* In other words, when a court concludes that a guilty verdict is against the weight of the evidence, the court is not deciding that acquittal is the only possible verdict. It "sits as a 'thirteenth juror' and disagrees with the jury's resolution of conflicting testimony." 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. *See also Hudson v. Louisiana, supra,* 450 U.S. at 44–45 & n. 5, 101 S.Ct. at 972–973 & n. 5, 67 L.Ed.2d at 34–35 & n. 5, in which the Supreme Court recognized the thirteenth juror concept.

The thirteenth juror idea does not, of course, mean that the judge is at liberty to grant a new trial simply because he would reach a different result than did the jury. *United States v. Rothrock,* 806 F.2d 318, 322 (1st Cir.1986). Nevertheless, under appropriate circumstances the evidence may be weighed, credibility evaluated, and a new trial ordered if it is " 'quite clear that the jury has reached a seriously erroneous result' " *i.e.,* a miscarriage of justice. *Rothrock,* 806 F.2d at 322 (quoting *Borras v. Sea–Land Service, Inc.,* 586 F.2d 881, 887 (1st Cir.1978)). Put slightly differently,

> When the [Rule 33] motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir. 1985). A majority of federal circuits that have considered the question are in agreement. *See United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir.1988); *United States v. Rodriquez,* 812 F.2d 414, 417 (8th Cir.1987); *United States v.*

*Martinez,* 763 F.2d 1297, 1312 (11th Cir.1985); *United States v. Rush,* 749 F.2d 1369, 1371 (9th Cir.1984), holding that a motion for new trial should be granted only if the evidence preponderates heavily against the verdict. But *cf. Government of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir.1987) ("motions for a new trial based on the weight of the evidence are not favored ... [and] are to be granted sparingly and only in exceptional circumstances"); *United States v. Johnson,* 487 F.2d 1278, 1280 (4th Cir.1973) ("Any attack on ... FBI agent's testimony at trial goes to ... credibility [and is] not properly cognizable on a motion for new trial").

When we turn to state courts, we find some that say explicitly that matters such as credibility are exclusively for the jury and may not be considered by a judge when a new trial is requested because the verdict was against the weight of the evidence. *See Ex Parte Nice,* 407 So.2d 874, 881–882 (Ala.1981); *People v. Gennings,* 196 Colo. 208, 210, 583 P.2d 908, 909 (1978); *State v. Lougiotis,* 130 Conn. 372, 375, 34 A.2d 777, 778 (1943); *State v. Bowle,* 318 So.2d 407, 408 (Fla.App.1975); *State v. Hall,* 203 Mont. 528, 534–535, 662 P.2d 1306, 1309 (1983); *State v. Chavez,* 101 N.M. 136, 138, 679 P.2d 804, 806 (1984); *People v. Carter,* 63 N.Y.2d 530, 536, 483 N.Y.S.2d 654, 657, 473 N.E.2d 6, 9 (1984);[25] *State v. Cabbage,* 571 S.W.2d 832, 835–836 (Tenn.1978); *State v. Williams,* 96 Wash.2d 215, 226–228, 634 P.2d 868, 875–876 (1981); *Smith v. State,* 564 P.2d 1194, 1198 (Wyo. 1977).

*Ex Parte Nice, supra,* was a case much like the one before us. A judge ordered a new trial in a criminal case because he had "strong doubts" about the credibility of a prosecuting witness. 407 So.2d at 875–876. After concluding that its constitutionally-conferred superintending power

---

**25.** Although trial courts in New York have no authority to grant a new trial in a criminal case when the verdict is against the weight of evidence, *People v. Carter,* 63 N.Y.2d 530, 536, 483 N.Y.S.2d 654, 657, 473 N.E.2d 6, 9 (1984), intermediate appellate courts are granted this power by statute. *See* N.Y.Crim.Proc. § 470.15(5) (Consol.1986).

permitted it to issue writs of mandamus, the Supreme Court of Alabama did so. *Id.* at 877–882. The court expressly rejected the thirteenth juror philosophy, *id.* at 881–882, reasoning that the jury is the arbiter of credibility and that the " 'trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable.' " *Id.* at 878–879 (quoting *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir.1976)). The *Nice* court's reliance upon *Cravero*, however, suggests that its analysis is flawed. *Cravero* was a sufficiency of evidence case, and the Alabama court confused the approach to sufficiency with the approach to weight of the evidence.

In like manner Colorado, somewhat more forthrightly, has simply said that credibility and other questions of fact are for the jury alone. *See People v. Noga*, 196 Colo. 478, 480, 586 P.2d 1002, 1003 (1978); *People v. Gennings, supra.* But *Noga* and *Gennings*, we note, are judgment of acquittal cases, not new trial cases.

Other courts that have rejected the thirteenth juror notion based upon flawed reasoning include *State v. Cabbage* and *State v. Williams*, both *supra.* These courts rejected the rule in part because they feared that *Burks v. United States*, would prohibit retrial of defendants whose verdicts were set aside as being against the weight of the evidence. *See State v. Cabbage*, 571 S.W.2d at 835–836; *State v. Williams*, 96 Wash.2d at 227, 634 P.2d at 875–876. These concerns no longer have any validity in light of *Tibbs v. Florida, supra*, 457 U.S. at 42–43, 102 S.Ct. at 2218–2219, 72 L.Ed.2d at 661–662, where the Supreme Court held that double jeopardy did not bar retrial under those circumstances.

A somewhat similar confusion is seen in *State v. Ladabouche*, 146 Vt. 279, 502 A.2d 852 (1985). Construing its Rule 33 (substantially the same as Fed.Rule Crim.Proc. 33), the Supreme Court of Vermont held that "a new trial based upon weight of the evidence should be granted only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result."

*Id.* at 285, 502 A.2d at 856. The resolution of questions of fact is assigned to the jury, reasoned the court, and because "[t]he 'thirteenth juror' standard ... would permit the trial court to order a retrial whenever it disagreed with the outcome ..., [that] rule would seriously intrude on the jury function." *Id.* The problem with this reasoning, of course, is that the thirteenth juror approach does *not* allow the trial court to order a new trial simply because the judge would have reached a result different from that reached by the jury. *See, e.g., United States v. Rothrock, supra,* 806 F.2d at 322. The Vermont court simply misunderstood the concept. Moreover, three of the four federal cases it cites in support of its view of the jury's role are cases in which the federal court indicated that credibility is an appropriate factor for consideration on a weight of the evidence motion for new trial: *United States v. Arrington,* 757 F.2d at 1485; *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980); *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979).

On the other side of this issue stands the greater weight of authority generally accepting the view that credibility is an appropriate factor to consider on a weight of the evidence motion for new trial. Most of these courts, although accepting the principle that a judge may weigh evidence on a motion for new trial, have not used the thirteenth juror terminology. *See State v. Harrington,* 27 Ariz.App. 663, 665–666, 558 P.2d 28, 30–31 (1976); *People v. Cartwright,* 98 Cal.App.3d 369, 381, 159 Cal.Rptr. 543, 549–550 (1979); *Forbes v. United States,* 390 A.2d 453, 459 (D.C.App.1978); *Robinson v. State,* 462 So.2d 471, 476–477 (Fla.Dist.Ct.App. 1984), *review denied,* 471 So.2d 44 (Fla.1985); *Josey v. State,* 197 Ga. 82, 93–94, 28 S.E.2d 290, 296 (1943); *People v. Rey,* 136 Ill.App.3d 645, 650–651, 91 Ill.Dec. 496, 483 N.E.2d 982, 986 (1985); *State v. Sanders,* 260 Iowa 327, 329, 149 N.W.2d 159, 160 (1967); *State v. Bell,* 206 Kan. 36, 37, 476 P.2d 213, 214–215 (1970); *Commonwealth v. Woods,* 382 Mass. 1, 7–10, 413 N.E.2d 1099, 1103–1104 (1980); *People v. Johnson,* 128 Mich.App. 618, 622–623, 341 N.W.2d

160, 162 (1983); *Malone v. State,* 486 So.2d 360, 366 (Miss. 1986); *State v. Parker,* 543 S.W.2d 236, 240 (Mo.App.1976); *State v. Boratto,* 154 N.J.Super. 386, 406–407, 381 A.2d 794, 804–805 (1977), *aff'd in part, rev'd in part on other grounds,* 80 N.J. 506, 404 A.2d 604 (1979); *State v. Shepherd,* 288 N.C. 346, 353, 218 S.E.2d 176, 180–181 (1975); *State v. Kringstad,* 353 N.W.2d 302, 306–307 (N.D.1984); *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721 (1983); *Commonwealth v. Meadows,* 471 Pa. 201, 208–209, 369 A.2d 1266, 1270 (1977); *State v. Benevides,* 425 A.2d 77, 80–81 (R.I.1981). Some of these courts, on the other hand, have expressly applied the thirteenth juror concept. *See Dorman v. State,* 622 P.2d 448, 454 (Alaska 1981); *State v. Barnack,* 453 N.E.2d 348, 349 (Ind.Ct.App. 1983); *State v. Korman,* 439 So.2d 1099, 1100–1102 (La. App.1983).

Upon review of all these cases, we reiterate that there is a difference between a motion for judgment of acquittal and a motion for new trial based on weight of the evidence. The former, if granted, results in acquittal and the proper test is sufficiency of the evidence to convict. Weight and credibility are not at issue. The evidence must be read from the viewpoint most favorable to the prosecution and if so read any rational fact-finder would find it sufficient, the motion must be denied. The latter, if granted, results only in a new trial. As a consequence, a court has more latitude in considering it, and may take into account factors such as credibility. To conclude otherwise is to make the two types of motions essentially indistinguishable when the issue is the extent of evidence presented to the trier of fact.

Our rules do not contemplate the identity of these motions, and Art. 23 of our Declaration of Rights does not require that we so treat them, nor does it prohibit a court from considering, at least to the extent we shall shortly explain, weight of evidence and credibility. Indeed, as we have seen, one purpose of Art. 23 is to protect the criminal defendant from unfair oppression. Oppression may come from hostile or biased judges; the jury's ability to acquit via

a general verdict protects against that, *see* n. 23, *supra,* and today's decision does not reduce that protection. But oppression may also flow from a jury swayed by emotion, bias, or popular clamor. Today's decision does look to protecting the defendant from that, since it gives limited authority to a trial judge to set aside a verdict that is against the weight of the evidence. Our conclusion that Art. 23 does not prohibit this is, therefore, consistent with that provision's overall goals or objectives. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 511, 525 A.2d 628, 631 (1987) (legislation should be construed in light of the legislative aim or goal).

### IV. *Conclusion*

We hold that Judge Miller had authority to weigh the evidence and to consider the credibility of witnesses when he decided Katz's motion for new trial. Accordingly, we overrule *State v. Devers, supra,* to the extent it holds that sufficiency of the evidence is the standard to be applied on a motion for new trial based on the allegation that a verdict is against the evidence or against the weight of the evidence. We also overrule *Devers* to the extent it holds that what is now Article 23 of the Declaration of Rights precludes the broader standard of review we here permit. Any other case, to the extent it so holds, is also overruled.

 We do not embrace the thirteenth juror rule *eo nomine,* for as we have seen, the very name of that rule may tend to produce confusion. We simply hold that reviewing weight of the evidence of necessity involves a weighing process, and part of that weighing may implicate consideration of credibility. But a trial judge is not at liberty to set aside a verdict of guilt and to grant a new trial merely because the judge would have reached a result different from that of the jury's. Motions for new trial on the ground of weight of the evidence are not favored and should be granted only in exceptional cases, when the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to let the verdict stand.

And in the area of credibility, a reviewing judge ordinarily should not make a credibility determination if there is nothing more than conflicting testimony; there should usually be at minimum substantial impeachment of a witness before the judge finds that witness's testimony deficient on the basis of credibility. *See, generally, United States v. Rothrock,* 806 F.2d at 322, *United States v. Arrington,* 757 F.2d at 1485–1486; *United States v. Lincoln,* 630 F.2d at 1319; *Dorman v. State,* 622 P.2d at 454.

To grant or deny a motion for new trial on the basis that a verdict is against the weight of the evidence is, of course, a discretionary matter. *United States v. Rodriquez,* 812 F.2d at 417; *United States v. Rothrock,* 806 F.2d at 321; *United States v. Martinez,* 763 F.2d at 1312; *State v. Ladabouche,* 146 Vt. at 285, 502 A.2d at 856; C. Torcia, *Wharton's Criminal Procedure* § 596 (12th rev. ed. 1976); 3 C. Wright, *Federal Practice and Procedure* § 553 (3d ed. 1982). We shall not in this case decide whether Judge Miller's order was an abuse of discretion. Even assuming that the order here was an abuse of discretion, that does not require us to issue an extraordinary writ. In Part III.A. of this opinion, *supra,* we explained that extraordinary writs issue only under extraordinary circumstances. We now reemphasize that proposition.

 The issuance of mandamus or prohibition in aid of appellate jurisdiction is usually a matter of discretion with the appellate court. An extraordinary writ is appropriate only when judicial power has been usurped or if there is a clear abuse of discretion. *Schlagenhauf v. Holder,* 379 U.S. 104, 110, 85 S.Ct. 234, 238, 13 L.Ed.2d 152, 159 (1964). In *Schlagenhauf* the Supreme Court approved the issuance of mandamus, but only under what it termed "unusual circumstances...." *Id.* The case concerned "the basic, undecided question [of first impression] whether a district court could order the mental or physical examination of a defendant" under Fed.R.Civ.P. 35. *Id.* In that case mandamus was justified because "there was real doubt whether the District Court had any power at all to order a defendant

to submit to a physical examination." *Will v. United States,* 389 U.S. 90, 104–105 n. 14, 88 S.Ct. 269, 278 n. 14, 19 L.Ed.2d 305, 316 n. 14 (1967).

In *Will,* the Court again cautioned that mandamus in aid of appellate jurisdiction should be rarely used, in criminal cases, because of speedy trial and double jeopardy considerations. It observed that it had "never approved the use of the writ to review an interlocutory procedural order in a criminal case which did not have the effect of a dismissal." *Id.* at 98, 88 S.Ct. at 275, 19 L.Ed.2d at 312. It vacated the order issuing the writ. And in *Will v. Calvert Fire Ins. Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), the Court disapproved issuance of mandamus when a district court judge refused to proceed with immediate adjudication of a matter although a substantially identical matter was pending between the same parties in state court. It said "[w]here a matter is committed to the discretion of a district court, it cannot be said that a litigant's right to a particular result" is so clear and indisputable as to warrant issuance of the writ. 437 U.S. at 665–666, 98 S.Ct. at 2559, 57 L.Ed.2d at 514. *Compare La Buy v. Howes Leather Co.,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (writ will issue where district court judge shows persistent disregard of rules of civil procedure), and *United States v. United States Dist. Ct.,* 334 U.S. 258, 68 S.Ct. 1035, 92 L.Ed. 1351 (1948) (writ will issue to compel obedience to appellate court's mandate).

Closer factually to the case before us (albeit in a civil context) is *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). In that case a district court judge granted a motion for new trial because he had made erroneous evidentiary rulings, and because the evidence did not support the amount of the verdict. The plaintiff then persuaded the Court of Appeals for the Tenth Circuit to issue a writ of mandamus ordering the trial court to reinstate the jury verdict as to liability, but permitting a new trial as to damages. The Supreme Court reversed. Stressing that "the remedy of mandamus is a drastic one, to

be invoked only in extraordinary situations," the Court explained that "[a] trial court's ordering of a new trial rarely, if ever, will justify the issuance of a writ of mandamus." *Id.* at 34–36, 101 S.Ct. at 190, 66 L.Ed.2d at 196–197. It summarized the doctrine thus: "In short, our cases have answered the question as to the availability of mandamus in situations such as this with the refrain: 'What never? Well hardly ever!' " [26]

In the case before us, Judge Miller granted a motion for a new trial in a criminal case, an action he had the power to take. He did so upon a weighing of the evidence, a permissible procedure, and because he thought to do otherwise might produce "injustices." Petitioner here does not persuade us that this case falls within the "hardly ever" category. Its burden is to show us that the circumstances are so extraordinary as to justify issuance of a writ. There is nothing in this record that so persuades us. We shall dismiss the petition, thus leaving Judge Miller's order for new trial in place.

PETITION FOR WRIT OF MANDAMUS OR FOR WRIT OF PROHIBITION DISMISSED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.

---

**26.** The "refrain" is from one of Captain Corcoran's songs in Gilbert & Sullivan's "H.M.S. Pinafore."