920 A.2d 1049

Nancy FORSTER

v.

Edward R.K. HARGADON.

Misc. No. 8, Sept. Term, 2006.

Court of Appeals of Maryland.

April 11, 2007.

Peter F. Rose, Asst. Public Defender (Nancy S. Forster, Public Defender), for appellant.

Steven M. Sulivan, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), for appellee.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (Retired, specially assigned) and ALAN M. WILNER, (Retired, specially assigned), JJ.

WILNER, J.

Before us is a petition by Nancy S. Forster, the Public Defender of Maryland, for a writ of prohibition, writ of mandamus, or other appropriate relief, in which she asks that we vacate a directive and order issued by Edward R.K. Hargadon, a judge of the Circuit Court for Baltimore City, that Ms. Forster believes are both substantively unlawful and constitute an impermissible local rule. With the petition was a motion to stay the directive and order pending our decision on the petition, which we granted.

The order, which is set out below, imposes certain procedural requirements on parties who file exceptions to the report of a master in juvenile cases and permits the court to dismiss the exceptions if those requirements are not met. The directive directs the court clerk to enter the order in each exceptions case, so that the order and its requirements will be case-specific. We shall dismiss the petition and revoke the stay.

## BACKGROUND

Maryland Rule 2–541 authorizes the judges of a Circuit Court to appoint one or more standing masters and to refer cases to those masters. The role of the master, as set forth in Rule 2–541, is to conduct a hearing in the matter and make a report to the court that includes the master's findings of fact, conclusions of law, recommendations, and a proposed order or judgment. Rule 2–541 is a rule that applies generally to masters. Maryland Rule 11–111, which generally tracks provisions in Maryland Code, § 3–807 of the Cts. & Jud. Proc. Article (CJP), provides greater specificity with respect to the procedures governing exceptions taken to a master's report in Juvenile cases.[1]

With an exception not relevant here, Rule 11–111a.2. authorizes a Juvenile Court master to hear any case or matter

---

1.  Although CJP § 3–807 appears in the subtitle dealing with children in need of assistance, § 3–8A–04 expressly makes that section applicable to delinquency proceedings as well.

assigned by the court. Proceedings before a master are recorded. CJP § 3–807(b)(2); Rule 11–110a. In keeping with the limited role of the master, both the Rule and the statute specify that the findings, conclusions, and recommendations of the master do not constitute final orders or final action by the court. Rule 11–111a.2. and CJP § 3–807(d)(1). Within ten days after the conclusion of a disposition hearing, the master must transmit to the judge the entire file in the case, together with a written report of the master's findings, conclusions, and recommendations. A copy of the report is served on each party to the proceeding.

Both CJP § 3–807(c)(1) and Rule 11–111c. permit any party to file exceptions to any or all of the master's proposed findings, conclusions, recommendations, or order. Rule 11–111c. specifies, however, that "[e]xceptions shall be in writing, filed with the clerk within five days after the master's report is served upon the party, *and shall specify those items to which the party excepts, and whether the hearing is to be de novo or on the record.*" (Emphasis added). Those requirements are also set forth, in generally similar language, in the statute. *See* CJP § 3–807(c)(1) and (2). Both the Rule and the statute permit an excepting party, other than the State in a delinquency case, to elect a hearing *de novo* or one on the record made before the master. Rule 11–111 c. and CJP § 3–807(c)(2).[2]

Both the Rule and the statute make clear that, whether the hearing is *de novo* or on the record, *"the hearing shall be limited to those matters to which exceptions have been taken."* (Emphasis added). *See* Rule 11–111c. and CJP § 3–807(c)(4). As noted, all of those requirements—that exceptions specify whether the hearing before the court is to be *de novo* or on the record, that, in either event, they specify the issues to which the aggrieved party excepts, and that the hearing,

---

2. If the State is the excepting party in a delinquency case, the hearing before the court is on the record before the master, although the judge may permit the record to be supplemented by additional evidence that the judge considers relevant and to which there is no objection. *See* CJP § 3–807(c)(3) and Rule 11–111c.

whether *de novo* or on the record, is limited to those matters to which exceptions have been taken—are imposed by State law and are Statewide in application,

The Circuit Court for Baltimore City is the largest and busiest of the State's 24 Circuit Courts. In FY 2006, it had over 63,500 total filings, including more than 24,500 criminal cases, 17,400 civil cases, 11,700 family cases, and 9,700 juvenile cases. Included in the juvenile filings were over 7,100 delinquency cases. The court's 9,700 juvenile filings were almost double the number in the next largest courts, and the 7,100 delinquency filings also far exceeded the number in any other county. During FY 2006, the Circuit Court for Baltimore City conducted more than 83,000 juvenile hearings, which represents more than 50% of the total number of juvenile hearings held throughout the State.

Maryland Rules 16–101 and 16–202 charge the Administrative Judge of each Circuit Court with overall responsibility for the management of the court. Rule 16–101d.2.(ii), for example, makes the Administrative Judge responsible for the "supervision and expeditious disposition of cases filed in the court and the control of the trial calendar and other calendars." Rule 16–202a. requires the Administrative Judge to supervise the assignment of actions for trial "to achieve the efficient use of available judicial personnel and to bring pending actions to trial and dispose of them as expeditiously as feasible." Rule 16–101d.3. permits the Administrative Judge to delegate to other judges any of those administrative responsibilities, duties, and functions.

In order to manage the court's heavy docket, the Administrative Judge of the Circuit Court for Baltimore City, acting pursuant to those and other Rules and the court's case management plan adopted pursuant to Rule 16–202b., created divisions of the court, designated judges to head those divisions, and delegated some administrative responsibilities to those judges. The Juvenile Division of the court consists of three judges, including a Judge–in–Charge, and ten masters. The masters conduct most of the hearings. Under the court's

case management system, the juvenile docket is distributed evenly among eight of the masters, each of whom handle approximately 2,700 cases a year. A ninth master conducts emergency arraignments and shelter care hearings, and the tenth presides over an overflow trial court. In FY 2006, the juvenile masters in Baltimore City conducted over 28,000 hearings in delinquency cases.

Judge Hargadon was designated as the Judge–in–Charge of the Juvenile Division and, as such, was charged, among other responsibilities, with "establish[ing] policies and procedures for the day-to-day operation of the juvenile court subject to the approval of the administrative judge" and "provid[ing] administrative guidance to the deputy clerk, helping with day-to-day procedural issues." In addition to those administrative duties, the Judge–in–Charge also provides back-up assistance to the presiding juvenile court judges, who conduct hearings of all kind, including both *de novo* and on-the-record hearings on exceptions to reports from masters. In FY 2006, the judges conducted over 11,000 hearings in delinquency cases.

In the furtherance of his administrative duties as Judge–in–Charge of the Juvenile Division and in further implementation of Maryland Rule 11–111 and CJP § 3–807, Judge Hargadon, after conferring with one or more of his colleagues on the court, representatives from the State's Attorney's Office, the Public Defender's Office, the Legal Aid Bureau, and the Department of Social Services, and other interested persons and groups, developed a form order that, on November 11, 2006, he directed the clerk to enter routinely in each case in which exceptions had been noted to a master's report. That order, which the Public Defender asks this Court to vacate, provides as follows:

"An Exception having been filed from a Recommendation of a Master in the above-captioned matter, it is, pursuant to Maryland Rule 11–111 and Md.Code Cts. & Jud. Proc. § 3–807, ORDERED that:

1. The Court may, upon motion of a party or *sua sponte,* dismiss the exception if the exception does not state with specificity:

a. The items to which the party takes exception; and

b. Whether the exception hearing is to be heard on the record or *de novo.*

2. If the party filing an exception requests a hearing on the record, and unless the presiding judge or the Judge–in–Charge orders otherwise:

a. That party shall, no later than 10 days from the date of this ORDER, file a memorandum which:

i. Specifies any finding of fact and conclusion of law to which that party is taking exception; and

ii. Specifies the reason(s) as to why the Master's recommended finding of fact(s) or conclusion(s) of law is in error; and

b. Any other party to the hearing shall file a responsive memorandum no later than 10 days after the filing of the excepting party's memorandum;

3. Pursuant to Md.Code Cts. & Jud. Proc. § 3–807(c) and Maryland Rule 11–111(c), if the party filing an exception requests a hearing *de novo:*

a. Any evidence presented shall be limited to the specific issues raised in the exception; and

b. The Court may rely upon the evidence recorded before the master for any matters to which an exception was not raised.

4. In addition to the delivery of copies of the exception and the memorandum to all parties, the party filing an exception or memorandum shall deliver a copy of the exception and the memorandum to the presiding judge, or if a judge has not been designated, to the Judge–in–Charge.

5. A transcript of the proceedings before the master need not be prepared prior to the hearing on the exception unless the Court so orders.

6. Any issue not specifically set forth in the exception and the accompanying memorandum is waived unless the Court finds there was good cause for not specifying the issue."

Although, as noted, Judge Hargadon conferred with a number of interested persons and groups, including one or more of his judicial colleagues, in developing the order, it does not appear that the order was ever formally or officially adopted or blessed by the Circuit Court as such, or even by a majority of its members. By reason of his instruction to the Deputy Clerk, however, a copy of the order, once signed by either Judge Hargadon or another judge in the Juvenile Division, is entered routinely in every exceptions case.

In her petition, the Public Defender complains that the order is "unnecessary, burdensome, illegal, and unconstitutional" and that the directive that it be filed in every case "constitutes an illegal circuit or local rule in violation of Maryland Rule 1–102" and "violates a juvenile's constitutional due process right to have judicial review of a master's findings." More specifically, the Public Defender objects (1) to the requirement that the excepting party file a memorandum within ten days that specifies the finding or conclusion of the master to which the party excepts, which she contends is a "burdensome requirement" that may delay a hearing on the exceptions, (2) to the provision that any additional evidence to be offered at a *de novo* hearing will be limited to that relevant to the issues raised in the exceptions, which she contends "effectively eliminates *de novo* exceptions as an option for the party," and (3) to the prospect of dismissal of the exceptions as a sanction for non-compliance, which she concludes is unauthorized.

## DISCUSSION

In the 231–year history of this Court, following the adoption of our first Constitution in 1776, we have had only three occasions to opine in any significant detail on the authority of the Court to issue writs of mandamus or prohibition and the standards for determining when, assuming the authority, such writs might appropriately be issued—all within the past twenty years. *See In re Petition for Writ of Prohibition,* 312 Md. 280, 539 A.2d 664 (1988); *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 752 A.2d 200 (2000); and *State v. Manck,* 385 Md.

581, 870 A.2d 196 (2005). Although there have been other cases in which the Court was asked to issue such writs and some discussion does appear in some of those cases, the principles presently governing both authority and propriety come mostly from those three cases, which have taken account of earlier pronouncements.

In *In re Petition,* we set out the framework of analysis. The petition, filed by the State, arose from a criminal action in which, following a jury verdict of guilty, the judge, expressing the view that the verdict was unjust and against the weight of the evidence, ordered a new trial. The State had no right to appeal from that decision, but, arguing that the judge had no authority to grant a new trial on that ground, asked that we issue a writ of mandamus or prohibition and vacate the order.

The first question was whether the Court had any authority to issue such a writ. We began by noting and confirming that this Court has only appellate jurisdiction. *In Re Petition for Writ of Prohibition,* 312 Md. 280, 293, 539 A.2d 664, 670 (1988).[3] Writs of mandamus and prohibition, however, are common law writs that invoke the *original* jurisdiction of a court, and, until our decision in that case, it was not at all clear whether, or in what circumstances, this Court had any jurisdiction to issue such a writ. *See id.,* at 295–98, 539 A.2d at 671–72.

After some review of the historical development of the writs and earlier cases in this Court, we declared that we had "long recognized the availability of writs such as mandamus or prohibition, in aid of our *appellate* jurisdiction, even if we have almost never exercised the power to issue them." *Id.* at 297. 539 A.2d at 672. (Emphasis added). The question posed was what was meant by "in aid of" appellate jurisdiction—whether

---

**3.** There are some limited exceptions to that precept, but they are expressly set forth in the Constitution. Article II, § 6, for example, provides original jurisdiction in the Court to resolve disputes arising from the alleged physical or mental disability of the Governor or Lieutenant Governor. Article III, § 5 provides original jurisdiction to review contests over legislative redistricting.

there had to be an appeal or an appealable judgment before this Court could issue such a writ. An examination of case law around the country convinced us that "mandamus or prohibition may issue in aid of appellate jurisdiction even though no appellate proceeding is pending in the appellate court, at least where there is some potentiality of eventual appellate review by appeal or by certiorari." *Id.* at 302–03, 539 A.2d at 675.

Having anchored the *authority* to issue such a writ in the preservation or aid of the Court's appellate jurisdiction, we considered the circumstances under which those writs *should* issue. We noted that they were, indeed, extraordinary writs, to be issued with great caution. We rejected the more extreme notion that the writs were available only to control actions beyond the jurisdiction of the lower court and concluded that "we may issue a prerogative writ if we believe the interests of justice require us to do so in order to restrain a lower court from acting in excess of its jurisdiction, otherwise grossly exceeding its authority, or failing to act when it ought to act." *Id.* at 307, 539 A.2d at 677. Our ultimate conclusion in that regard was that "[a]n extraordinary writ is appropriate only when judicial power has been usurped or if there is a clear abuse of discretion." *Id.* at 327, 539 A.2d at 687. Borrowing from the Supreme Court's notion that mandamus *could* but "hardly ever" *should* issue in situations like the one before us, we dismissed the petition.

The second case—*Philip Morris*—arose out of a comprehensive class action against the tobacco industry. When the Circuit Court for Baltimore City certified several classes and set forth a three-phase trial schedule, the defendants petitioned this Court for a writ of mandamus or prohibition that would decertify the class, arguing that the trial court grossly abused its discretion and acted unlawfully in certifying the classes. Building upon *In re Petition* and some of the much earlier judicial comments cited therein, we observed that while "this Court may, and of right ought, for the sake of justice, to interpose in a summary way to supply a remedy where, for the want of a specific one, there would otherwise be a failure of

justice," it was nonetheless "well settled in this State that a writ of mandamus will not be granted where the petitioner has a specific and adequate legal remedy to meet the justice of the particular case and where the law affords [another] adequate remedy." *Philip Morris v. Angeletti, supra,* 358 Md. at 712, 752 A.2d at 212, quoting from *Runkel v. Winemiller,* 4 H. & McH. 429, 449 (Gen. Ct. Oct. Term 1799) and *Brack v. Wells,* 184 Md. 86, 90–91, 40 A.2d 319, 321 (1944).

*Philip Morris* was truly an extraordinary case. The Court pointed out that "[t]he litigation plan approved by the Circuit Court in this case necessarily involves the commitment of such an extraordinary amount of the judicial and other resources of the busiest trial court in the State that any subsequent appellate review of the lower court's Class Certification Order is rendered inadequate and ineffective." *Id.* 358 Md. at 714, 752 A.2d at 213. It was for that reason that we undertook a review of that Order and found it to be wholly inappropriate for a variety of reasons. We therefore issued the writ and vacated the Order.

*State v. Manck* arose from a death penalty case in which a trial judge struck the State's notice of intention to seek the death penalty in the belief that, because the indictment failed to allege that the defendant was a principal in the first degree in the murder of the victim, it w as legally insufficient to charge a capital punishment crime. The State had no right to appeal from that ruling, which effectively precluded the State from seeking the death penalty, but filed a petition for mandamus, prohibition, or other appropriate relief asking that we direct the judge to vacate his order. Even though, in a later case, we concluded that the basis for the judge's ruling was wholly erroneous [4]—a belief expressed as well in the dissent in *Manck*—we denied the writ on the ground that it would not have been in aid of our appellate jurisdiction because the State had no right to appeal.

---

**4.** *See Evans v. State,* 389 Md. 456, 886 A.2d 562 (2005).

Harking back to the holding in *Philip Morris* that these extraordinary writs "will not be granted where the petitioner has a specific and adequate legal remedy to meet the justice of the particular case," a critical factor in this case is that the very issues presented in the petition filed by the Public Defender are currently pending in the Court of Special Appeals in two cases, *In re Marcus J.*, Sept. Term 2006, No. 2503, and *In re Martel R.*, Sept. Term 2006, No. 2502. Both of those appeals are from the dismissal of exceptions to a master's report, pursuant to an order in the form devised by Judge Hargadon, for failure to comply with the order. Both of those appeals were filed by the Public Defender in December, 2006, but, curiously, although urging the need for swift and extraordinary action by this Court to correct what the Public Defender views as a gross injustice arising from Judge Hargadon's order, the Public Defender, in direct contradiction to a representation made to this Court in her motion to stay Judge Hargadon's order, has agreed to a very substantial delay in the processing of the two pending appeals.[5]

---

**5.** The records of the Court of Special Appeals show that the appeal in *In re Marcus J.* was noted December 14, 2006, and that the record was transmitted to the Court of Special Appeals on January 30, 2007. Ordinarily, the appellant's brief would be due within 40 days after the filing of the record, and the State's brief would be due within 30 days thereafter. *See* Maryland Rule 8–502(a)(1) and (2). In conformance with a stipulation signed by the Office of the Public Defender, however, the due date for the filing of appellant's brief has been delayed for nearly ten months, to January 2, 2008, and the case is not set for argument until March, 2008. The same situation pertains in *In re Martel R.* The appeal was noted December 13, 2006, and the record was received by the Court of Special Appeals on January 30, 2007—the same day the record was received in *Marcus J.* The Public Defender's brief would ordinarily be due 40 days thereafter, yet the Public Defender stipulated to a nearly nine-month delay, to December 3, 2007, thereby delaying argument to February, 2008.

In her motion to stay Judge Hargadon's order, filed in this Court in December, 2006, the Public Defender called attention to the two appeals and stated that "[t]he Office of the Public Defender likely will seek to expedite the above-mentioned two cases in accordance with Maryland Rule 8–207(b). Moreover, the Office of the Public Defender likely will file a pre-judgment Petition for Writ of Certiorari with this Court in accordance with Maryland Rule 8–302(b), in the above-mentioned two cases." Obviously, the Public Defender did neither of those things.

The Public Defender, on behalf of her two juvenile clients, may raise and have resolved in those two cases every complaint about Judge Hargadon's order that she raises in this action. She may, as she did in the Circuit Court in those cases, argue that the order is an impermissible local rule, and she may argue that it is substantively invalid. If she loses in the Court of Special Appeals, she may, on behalf of her clients, seek *certiorari* in this Court; indeed, she could have asked this Court to bring the two cases directly before us on a bypass petition for *certiorari, as she told us she likely would do.* It is thus clear, really beyond cavil, that the normal appellate process is fully available to resolve her complaints. There is simply no basis whatever for this Court, by issuing extraordinary prerogative writs that we have consistently maintained should be issued rarely and only with great caution, to shortcut that process, especially when the Public Defender has, acquiesced in substantial delays in the operation of the normal process. This kind of end run around the normal and available appellate process would do nothing "to prevent disorder, from a failure of justice," (*Runkel v. Winemiller, supra,* 4 H. & McH. at 449; *Doering v. Fader,* 316 Md. 351, 361, 558 A.2d 733, 738 (1989); *In re Petition, supra,* 312 Md. at 307, 539 A.2d at 678), but would, instead, promote such disorder.

PETITION DISMISSED AND STAY REVOKED; COSTS TO BE PAID BY PETITIONER.

Once she received her requested stay, the Office affirmatively allowed the two pending appeals to languish.